[No. D041421. Fourth Dist., Div. One. May 6, 2004.]

THE TRADITIONAL CAT ASSOCIATION, INC., et al., Plaintiffs and Respondents, v.
LAURA GILBREATH et al., Defendants and Appellants.

**[CERTIFIED FOR PARTIAL PUBLICATION[1]]**

---

[1] Pursuant to California Rules of Court, rule 976.1, this opinion is certified for publication with the exception of Discussion part II.

**COUNSEL**

Law Offices of Darren J. Quinn and Darren J. Quinn for Defendants and Appellants.

Goode, Hemme, Peterson, Sayler & Lund, Jerry D. Hemme and James W. Peterson for Plaintiffs and Respondents.

OPINION

**BENKE, Acting P. J.**— ■ In California the accrual of causes of action growing out of the publication of defamatory or other tortious statements is governed by the single-publication rule. Under the rule, one cause of action will arise, and the statute of limitations will commence running, upon the first general publication or broadcast of a tortious statement, notwithstanding how many copies of the publication are distributed or how many people hear or see the broadcast. Any subsequent republication or rebroadcast gives rise to a new single cause of action.

■ We find the single-publication rule applies to statements published on Internet Web sites. Because the statements which give rise to plaintiffs' cause of action for defamation were posted on a Web site maintained by one of the defendants more than a year before plaintiffs' complaint was filed, plaintiffs' defamation cause of action is barred by the applicable statute of limitations, Code of Civil Procedure[2] section 340.

Accordingly, the trial court should have granted defendants' motion to strike the defamation cause of action.

## SUMMARY

Plaintiff and respondent Diana Fineran and defendants and appellants Laura Gilbreath, Lee Zimmerman, Randi Briggs and John Herold are all very interested in cat breeding. The record discloses Fineran was the president and the individual defendants were all officers and directors of defendant and appellant Traditional Cat Association (TCA). In 1998 a dispute developed between Fineran and the individual defendants with respect to criticism of Fineran's leadership of TCA. As the result of the dispute, Fineran established another organization, plaintiff and respondent The Traditional Cat Association, Inc., a Washington corporation (TTCA). TTCA then commenced a series of lawsuits against TCA and the individual defendants, alleging that they had

---

[2] All further statutory references are to the Code of Civil Procedure unless otherwise indicated.

misappropriated TCA funds and were guilty of conversion, copyright infringement, unfair competition, trademark and trade secret infringement.[3]

In response to the litigation, in 1998 defendant John Herold created a Web site on the Internet which he named "The Diana Fineran Response Website." The Web site purported to report on the status of the litigation initiated by Fineran. The descriptions of the litigation on the Web site were highly critical of Fineran and TTCA and very favorable to TCA, Herold and the other defendants.

On May 22, 2002, Fineran and TTCA filed the instant action against Herold, TCA and the other defendants. Fineran and TTCA alleged that the statements on the Web site gave rise to a cause of action for defamation. She also alleged unfair competition and conversion causes of action.

Herold and the other defendants challenged the complaint by way of a motion to strike and a demurrer. The motion to strike was directed primarily at the defamation cause of action. The demurrer challenged all three causes of action. In support of the motion to strike, Herold submitted a declaration in which he stated that he had not altered the Web site after May 21, 2001.

In ruling on the motion to strike, the trial court found the statements on the Web site were made in furtherance of the defendants' petition and free speech rights within the meaning of section 425.16, subdivision (b)(1). However, the court denied the motion to strike because it found, among other matters, the statute of limitations defenses asserted by the defendants, even if conclusive, will not support relief under the anti-SLAPP statute.

The court sustained the defendants' demurrer but gave TTCA and Fineran leave to amend.

Herold and the other defendants filed a timely notice of appeal from the order denying their motion to strike. (See § 425.16, subd. (j).)

---

[3] TTCA filed a small claims action in San Diego against Gilbreath which alleged that Gilbreath had converted records and money which belonged to TTCA. The San Diego small claims was dismissed. TTCA filed a small claims action against Briggs in Nevada County. The court in that case entered a judgment which awarded TTCA no damages and no costs. After the small claims actions were concluded, TTCA and Fineran filed a federal district court action against the defendants in this action. It alleged claims for an accounting, conversion, trade name and trade secret infringement, unfair competition, injunctive relief, and damages. Prior to trial, TTCA and Fineran dismissed all of their claims, except the claims for copyright infringement and conversion, without prejudice. Prior to trial the court dismissed the copyright claim and the jury was unable to reach a verdict on the conversion claim. Following trial the district court dismissed the conversion claim without prejudice on the grounds that it was no longer appropriate for it to exercise pendent jurisdiction over the case.

DISCUSSION

I

*Defamation*

A. *Statute of Limitations Defenses Support Anti-SLAPP Relief*

In considering plaintiffs' defamation cause of action, the first issue we must consider is the trial court's determination that statute of limitations defenses, even if meritorious, will not support a motion to strike under the anti-SLAPP statute.

■ A motion to strike under section 425.16, subdivision (b)(1), requires a trial court to engage in a two-step process. " 'First, the court decides whether the defendant has made a threshold prima facie showing that the defendant's acts, of which the plaintiff complains, were ones taken in furtherance of the defendant's constitutional rights of petition or free speech in connection with a public issue.' " (*Kashian v. Harriman* (2002) 98 Cal.App.4th 892, 906 [120 Cal.Rptr.2d 576].)[4] As we have noted, the trial court found that the statements which appeared on the Web site and which give rise to Fineran and TTCA's defamation cause of action were made in furtherance of the defendants' free speech and petition rights. This aspect of the trial court's ruling was plainly correct. Given the controversy surrounding the parties' dispute and its evident notoriety in the cat breeding community, the Web site statements concerned matters of public interest in the cat breeding community. (§ 425.16, subd. (e)(3); see *Tuchscher Development Enterprises, Inc. v. San Diego Unified Port Dist.* (2003) 106 Cal.App.4th 1219, 1233 [132 Cal.Rptr.2d 57]; *Damon v. Ocean Hills Journalism Club* (2000) 85 Cal.App.4th 468, 479–480 [102 Cal.Rptr.2d 205].) We also note our courts have repeatedly held that reports of judicial proceedings, such as appeared on the Web site, are an exercise of free speech within the meaning of section 425.16. (See *Sipple v. Foundation for Nat. Progress* (1999) 71 Cal.App.4th 226, 239 [83 Cal.Rptr.2d 677]; *Braun v. Chronicle Publishing Co.* (1997) 52 Cal.App.4th

---

[4] Section 425.16, subdivision (e), states: "As used in this section, 'act in furtherance of a person's right of petition or free speech under the United States or California Constitution in connection with a public issue' includes: (1) any written or oral statement or writing made before a legislative, executive, or judicial proceeding, or any other official proceeding authorized by law; (2) any written or oral statement or writing made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law; (3) any written or oral statement or writing made in a place open to the public or a public forum in connection with an issue of public interest; (4) or any other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest."

1036, 1043 [61 Cal.Rptr.2d 58]; *Lafayette Morehouse, Inc. v. Chronicle Publishing Co.* (1995) 37 Cal.App.4th 855, 867 [44 Cal.Rptr.2d 46].)

■    When a court finds that a defendant was furthering free speech or petitioning rights, "the burden then shifts to the plaintiff to establish a 'probability' of prevailing on the claim by making a prima facie showing of facts that would, if proved, support a judgment in the plaintiff's favor. [Citation.]" (*Kashian v. Harriman, supra,* 98 Cal.App.4th at p. 906.) "This standard is 'similar to the standard used in determining motions for nonsuit, directed verdict, or summary judgment,' in that the court cannot weigh the evidence. [Citations.] However, the plaintiff 'cannot simply rely on the allegations in the complaint' [citation], but 'must provide the court with sufficient *evidence* to permit the court to determine whether "there is a probability that the plaintiff will prevail on the claim." ' [Citation.]" (*ComputerXpress, Inc. v. Jackson* (2001) 93 Cal.App.4th 993, 1010 [113 Cal.Rptr.2d 625].) Importantly, the court can also consider a defendant's opposing evidence to determine whether it defeats a plaintiff's case as a matter of law. (*Kashian v. Harriman, supra,* 98 Cal.App.4th at p. 906; *Lafayette Morehouse, Inc. v. Chronicle Publishing, supra,* 37 Cal.App.4th at p. 867.)

Contrary to the express terms of the statute, the trial court ruled a statute of limitations defense "is not a proper issue for determination in a Motion to Strike under Code of Civil Procedure § 425.16. The only defense at issue in anti-SLAPP motion is the constitutional defenses involving the right to petition and free speech." The limitation imposed by the trial court on anti-SLAPP motions appears nowhere on the face of the statute or in its rationale.

■    In determining whether a plaintiff has demonstrated the requisite probability of prevailing, section 425.16, subdivision (b)(2), requires that the court "consider the pleadings, and supporting and opposing affidavits stating the facts upon which the *liability or defense* is based." (Italics added.) Thus on its face the statute contemplates consideration of the substantive merits of the plaintiff's complaint, as well as all available defenses to it, including, but not limited to constitutional defenses. This broad approach is required not only by the language of the statute, but by the policy reasons which gave rise to our anti-SLAPP statute. As the court in *Equilon Enterprises v. Consumer Cause, Inc.* (2002) 29 Cal.4th 53, 60 [124 Cal.Rptr.2d 507, 52 P.3d 685], stated: " 'Intimidation will naturally exist anytime a community member is sued by an organization for millions of dollars even if it is probable that the suit will be dismissed.' [Citation.] 'Considering the purpose of the [anti-SLAPP] provision, expressly stated, the nature or form of the action is not what is critical but rather that it is against a person who has exercised certain

rights.' [Citation.] 'The Legislature recognized that "all kinds of claims could achieve the objecive of a SLAPP suit—to interfere with and burden the defendant's exercise of his or her rights." ' " Similarly, a claim which is meritless because it is barred by the statute of limitations will cause just as much intimidation as a claim which is barred because of a constitutional defense. Both forms of meritless lawsuits are the subject of section 425.16.

In sum then, the statements on the Web site were an exercise of free speech which shifted to plaintiffs the burden of establishing the merits of their defamation cause of action, including its timeliness. As we explain more fully below, plaintiffs' defamation cause of action is barred by the statute of limitations.

## B. *Single-publication Rule*

Given the unique and dynamic character of the Internet, plaintiffs argue that their defamation cause of action arose continuously while the Web site was operating. Hence they contend that because Herold conceded that the Web site was operating at the time the motion to strike was made, the one-year statute of limitations for defamation (§ 340) had not expired at the time they filed their complaint. As we indicated at the outset, we do not accept this analysis. Plaintiffs' defamation claim is governed by the single-publication rule.

### 1. *California's Adoption of the Single-publication Rule*

In *Shively v. Bozanich* (2003) 31 Cal.4th 1230 [7 Cal.Rptr.3d 576, 80 P.3d 676], the court recently set forth the history and rationale of the single-publication rule. "Under the common law as it existed in the 19th century and early part of the 20th century, the principle that each communication of a defamatory remark to a new audience constitutes a separate "publication," giving rise to a separate cause of action, led to the conclusion that each sale or delivery of a copy of a newspaper or book containing a defamation also constitutes a separate publication of the defamation to a new audience, giving rise to a separate cause of action for defamation. (See 2 Harper et al., Law of Torts (1986) § 5.16, p. 126; 5 Witkin, Summary of Cal. Law [(9th ed. 1988)] Torts, § 479, p. 563.) This conclusion had the potential to subject the publishers of books and newspapers to lawsuits stating hundreds, thousands, or even millions of causes of action for a single issue of a periodical or edition of a book. This conclusion also had the potential to disturb the repose that the statute of limitations ordinarily would afford, because a new publication of the defamation could occur if a copy of the newspaper or book were preserved for many years and then came into the hands of a new reader who had not discovered it previously. The statute of limitations could be tolled indefinitely, perhaps forever, under this approach.

"The difficulties created by the early common law rule are illustrated in a 19th-century English case that concluded a plaintiff could bring an action seeking redress for libel against a publisher based upon an allegedly defamatory remark contained in a newspaper issued 17 years prior to the plaintiff's discovery of the defamation, on the theory that the sale to the plaintiff of the long-forgotten copy of the newspaper constituted a new publication, starting anew the running of the period of limitations. (*The Duke of Brunswick v. Harmer* (Q.B. 1849) 117 Eng.Rep. 75.) Despite the burdens created by the staleness and potential volume of the claims thus permitted, many American courts, and the reporters of the first Restatement of Torts, nonetheless adhered to the rule applied by the English court in the *Duke of Brunswick* case. (Rest.2d, Torts, § 578, com. b, p. 200; 1 Smolla, Law of Defamation [(2d ed. 1997)] § 4:93, p. 4-140.1.)

"Ultimately, many American courts began to reconsider the common law rule exemplified in the *Duke of Brunswick* case. These courts recognized that the advent of books and newspapers that were circulated among a mass readership threatened unending and potentially ruinous liability as well as overwhelming (and endless) litigation, as long as courts adhered to the rule that each sale of a copy of a newspaper or a book, regardless how long after original publication, constituted a new and separate publication. The early common law rule threatened a volume of litigation and a potential for indefinite tolling of the period of limitations that, these courts realized, would challenge the ability and willingness of publishers to report freely on the news and on matters of public interest. (See *Gregoire v. G.P. Putnam's Sons* (1948) 298 N.Y. 119 [81 N.E.2d 45, 46–48] [collecting cases]; see also *Hartmann v. Time, Inc.* (3d. Cir.1948) 166 F.2d 127, 134 [observing that the 19th century rule posed a threat to freedom of the press]; *Applewhite v. Memphis State University* (Tenn. 1973) 495 S.W.2d 190, 194 [noting that the rule posed threats of harassment, multiple recovery, and injury to the administration of justice]; *Winrod v. Time, Inc.* (1948) 334 Ill.App. 59 [78 N.E.2d 708, 709–710].)

"Seeking to avoid *both* the multiplicity and the staleness of claims permitted by the rule applied in the *Duke of Brunswick* case, courts fashioned what became known as the single-publication rule, holding that, for any single edition of a newspaper or book, there was but a single potential action for a defamatory statement contained in the newspaper or book, no matter how many copies of the newspaper or the book were distributed. (See, e.g., *Gregoire v. G.P. Putnam's Sons, supra,* 81 N.E.2d 45, 46–48; see also *Bradford v. American Media Operations, Inc.* (E.D.Pa.1995) 882 F.Supp. 1508, 1513–1514; *Rinaldi v. Viking Penguin, Inc.* (1981) 52 N.Y.2d 422 [420 N.E.2d 377, 380–382, 438 N.Y.S.2d 496]; *Winrod v. Time, Inc., supra,* 78 N.E.2d at pp. 708–709; Rest.2d Torts, § 577A, subd. (3); 2 Harper et al., Law of Torts, *supra,* § 5.16, pp. 126–128.) Of course, because each person who

takes a responsible part in a publication of defamatory matter may be held liable for the publication (see *Dunn v. Hearst* (1903) 139 Cal. 239, 241 [73 P. 138]; *Osmond v. EWAP, Inc.* (1984) 153 Cal.App.3d 842, 852 [200 Cal.Rptr. 674]), multiple causes of action, even under the single-publication rule, could be brought in one proceeding against *several defendants* for a single defamatory statement. (*Wathan v. Equitable Life Assur. Soc.* (C.D.Ill.1986) 636 F.Supp. 1530, 1533–1536; *Dubinsky v. United Airlines Master Executive Council* (1999) 303 Ill.App.3d 317 [708 N.E.2d 441, 454, 236 Ill.Dec. 855]; 14 West's U. Laws Ann. (1990) U. Single Publ. Act, comrs. note, p. 375.)

"Under the single-publication rule, with respect to the statute of limitations, publication generally is said to occur on the 'first general distribution of the publication to the public.' (*Belli v. Roberts Furs* (1966) 240 Cal.App.2d 284, 289 [49 Cal.Rptr. 625]; see also *Bradford v. American Media Operations, supra,* 882 F.Supp. at p. 1514 [collecting cases].) Accrual at that point is believed to provide adequate protection to potential plaintiffs, especially ·in view of the qualification that repetition of the defamatory statement in a *new edition* of a book or newspaper constitutes a new publication of the defamation that may give rise to a new cause of action, with a new accrual date. (See *Rinaldi v. Viking Penguin, Inc., supra,* 438 N.Y.S.2d 496 at p. 433.) Under this rule, the cause of action accrues and the period of limitations commences, regardless of when the plaintiff secured a copy or became aware of the publication. (See *Strick v. Superior Court* (1983) 143 Cal.App.3d 916, 923 [192 Cal.Rptr. 314]; *McGuiness v. Motor Trend Magazine* (1982) 129 Cal.App.3d 59, 62–63 [180 Cal.Rptr. 784]; *Belli v. Roberts Brothers Furs, supra,* 240 Cal.App.2d at p. 289; see also *Morgan v. Hustler Magazine* (N.D.Ohio 1987) 653 F.Supp. 711, 717; *Flynn v. Associated Press* (1988) 401 Mass. 776 [519 N.E.2d 1304, 1307–1308].)

"The single-publication rule largely has been codified in the Uniform Single Publication Act, which has been adopted in many states, including California. (Civ. Code, § 3425.3 (added by Stats. 1955, ch. 867, § 1, p. 1481);[5] *McGuiness v. Motor Trend Magazine, supra,* 129 Cal.App.3d at p. 61; *Belli v. Roberts Brothers Furs,. supra,* 240 Cal.App.2d at p. 288; see also 1 Smolla, Law of Defamation, *supra,* § 4:93, p. 4-140.2; 2 Harper et al., Law of Torts, *supra,* § 5.16, pp. 127–128 & fn. 8.) The Uniform Single Publication Act was intended to reflect the common law single-publication rule. (*Wathan v. Equitable Life Assur. Co., supra,* 636 F.Supp. at pp. 1533–1536; *Dubinsky v. United Airlines Master Executive Council, supra,*

---

[5] That section provides: "No person shall have more than one cause of action for damages for libel or slander or invasion of privacy or any other tort founded upon any single publication or exhibition or utterance, such as any one issue of a newspaper or book or magazine or any one presentation to an audience or any one broadcast over radio or television or any one exhibition of a motion picture. Recovery in any action shall include all damages for any such tort suffered by the plaintiff in all jurisdictions." (Civ. Code, § 3425.3.)

708 N.E.2d at p. 454; 14 West U. Laws Ann., *supra*, U. Single Publ. Act, comrs. note, p. 375.)" (*Shively v. Bozanich,* *supra*, 31 Cal.4th at pp. 1243–1246.)

In *Shively* the plaintiff argued that notwithstanding the single-publication rule and its premises, the statute of limitations on her claim should have been tolled until she discovered the publication. In rejecting this argument, the court in *Shively* stated: "As is evident, application of the discovery rule to statements contained in books and newspapers would undermine the single-publication rule and reinstate the indefinite tolling of the statute of limitations intended to be cured by the adoption of the single-publication rule. If we were to recognize delayed accrual of a cause of action based upon the allegedly defamatory statement contained in the book, A Problem of Evidence, on the basis that plaintiff did not happen to come across the statement until some time after the book was first generally distributed to the public, we would be adopting a rule subjecting publishers and authors to potential liability during the entire period in which a single copy of the book or newspaper might exist and fall into the hands of the subject of a defamatory remark. Inquiry into whether delay in discovering the publication was reasonable has not been permitted for publications governed by the single-publication rule. Nor is adoption of the rule proposed by plaintiff appropriate simply because the originator of a privately communicated defamatory statement may, together with the author and the publisher of a book, be liable for the defamation contained in the book. Under the rationale for the single-publication rule, the originator, who is jointly responsible along with the author and the publisher, should not be liable for millions of causes of action for a single edition of the book. Similarly, consistent with that rationale, the originator, like the author or the publisher, should not be subject to suit many years after the edition is published." (*Shively v. Bozanich, supra,* 31 Cal.4th at p. 1251.)

### 2.  *Web Publishing Is Subject to the Single-publication Rule*

The parties have not cited any California authority, and we have found none, which considers whether and how the single-publication rule applies when, as here, an alleged defamatory statement has been made on an Internet Web site. However, the issue was recently discussed by the New York Court of Appeals in *Firth v. State* (2002) 747 N.Y.S.2d 69, 71–72 [98 N.Y.2d 365, 775 N.E.2d 463]. In *Firth v. State* the court found that the single-publication rule applies to international publishers. The court stated: "Claimant argues that the single publication rule should not be applied verbatim to defamatory publications posted on the Internet in light of significant differences between Internet publications and traditional mass media. Instead, claimant maintains that because a Web site may be altered at any time by its publisher or owner

and because publications on the Internet are available only to those who seek them, each "hit" or viewing of the report should be considered a new publication that retriggers the statute of limitations. We disagree.

"Under the early common law of defamation, which claimant seeks to have applied in this case, each communication of a defamatory statement to a third person constituted a separate publication giving rise to a new cause of action (*Gregoire,* 298 N.Y. at 122–123, 81 N.E.2d 45 [citing *Duke of Brunswick v. Harmer*, 14 QB 185 (1849)]). In *Gregoire*, we held that a publisher's sale from stock of a copy of a book containing libelous language did not constitute a new publication. We explained that if the multiple publication rule were applied to such a sale, "the [s]tatute of [l]imitation[s] would never expire so long as a copy of such book remained in stock and is made by the publisher the subject of a sale or inspection by the public. Such a rule would thwart the purpose of the Legislature to bar completely and forever all actions which, as to the time of their commencement, overpass the limitation there prescribed upon litigation" (*id.* at p. 125–126, 81 N.E.2d 45 . . . ; see also *Wolfson v. Syracuse Newspapers,* 254 App.Div. 211, 4 N.Y.S.2d 640 [1938], *affd. without op.* 279 N.Y. 716, 18 N.E.2d 676 [1939]).

"In addition to increasing the exposure of publishers to stale claims, applying the multiple publication rule to a communication distributed via mass media would permit a multiplicity of actions, leading to potential harassment and excessive liability, and draining of judicial resources (see *Keeton v. Hustler Mag., Inc.,* 465 U.S. 770, 777, 104 S.Ct. 1473, 79 L.Ed.2d 790 [1984]; Restatement [Second] of Torts § 577A, Comment d, at p. 210, *supra*; Note, *Cyber-Defamation and the Single Publication Rule*, 81 B.U. L.Rev. 895, 898, 913 [2001]). Further, the single publication rule actually reduces the possibility of hardship to plaintiffs by allowing the collection of all damages in one case commenced in a single jurisdiction (*see* Restatement, Comment d; Note, 81 B.U.L. Rev. at 898). Thus, we have held that, absent republication, 'neither the time nor the circumstance in which a copy of a book or other publication finds its way to a particular consumer is, in and of itself, to militate against the operation of the unitary, integrated publication concept.' (*Rinaldi v. Viking Penguin*, 52 N.Y.2d 422, 433, 438 N.Y.S.2d 496, 420 N.E.2d 377 [1981]).

"The policies impelling the original adoption of the single publication rule support its application to the posting of the Inspector General's report regarding claimant on the State's Web site. Communications accessible over a public Web site resemble those contained in traditional mass media, only on a far grander scale. Those policies are even more cogent when considered in connection with the exponential growth of the instantaneous, worldwide

ability to communicate through the Internet. As aptly stated in *Reno v. American Civ. Liberties Union*, 521 U.S. 844, 853, 117 S.Ct. 2329, 138 L.Ed.2d 874 [1997], '[f]rom the publisher's point of view, [the World Wide Web] constitutes a vast platform from which to address and hear from a worldwide audience of millions of readers, viewers, researchers, and buyers.' Communications posted on Web sites may be viewed by thousands, if not millions, over an expansive geographic area for an indefinite period of time. Thus, a multiple publication rule would implicate an even greater potential for endless retriggering of the statute of limitations, multiplicity of suits and harassment of defendants. Inevitably, there would be a serious inhibitory effect on the open, pervasive dissemination of information and ideas over the Internet, which is, of course, its greatest beneficial promise (see, Note, *Cyber-Defamation and the Single Publication Rule*, 81 B.U. L.Rev. at 912–913; see also *Van Buskirk v. State Times Co.*, 2000 U.S. Dist. LEXIS 12150, *4–6 [S.D.N.Y., Aug. 24, 2000]). Thus, we hold that the single publication rule applies in this case." (*Firth v. State, supra,* 747 N.Y.S.2d at pp. 71–72.)

We find the reasoning of the court in *Firth v. State* persuasive. As the court in *Firth v. State* noted, the need to protect Web publishers from almost perpetual liability for statements they make available to the hundreds of millions of people who have access to the Internet is greater even than the need to protect the publishers of conventional hard copy newspapers, magazines and books. Importantly, the interests in free expression, which the court in *Firth v. State* found were worthy of protection by application of the single-publication rule to Web pages, are the very same interests which the court in *Shively v. Bozanich* relied upon in rejecting the notion the single-publication rule should be subject to any discovery exception. Given the protection the court gave those interests in *Shively v. Bozanich*, we have very little doubt that, like the court in *Firth v. State*, our Supreme Court would find that those interests require application of the single-publication rule to Web page publication.

### C. *Plaintiffs' Claim Was Barred by Section 340*

█ As we noted, according to Herold the Web site was not altered after May 21, 2001. In opposing the motion to strike, plaintiffs did not offer any evidence which contradicted Herold's declaration or provide admissible evidence that the statements on the Web site had been republished in other formats in the year preceding the filing of their complaint. We recognize that in an amended complaint filed after the motion to strike had been denied, plaintiffs alleged that the individual defendants had repeated the defamations in the year following May 21, 2001. Those allegations are not sufficient to defeat a motion to strike. In establishing the merits of their complaint

in the face of a motion to strike, plaintiffs cannot rely on allegations but must present admissible evidence which demonstrates the viability of their claims. (*Paul for Council v. Hanyecz* (2001) 85 Cal.App.4th 1356, 1364, fn. 5 [102 Cal.Rptr.2d 864]; *DuPont Merck Pharmaceutical Co. v. Superior Court* (2000) 78 Cal. App.4th at p. 563, 568 [92 Cal.Rptr.2d 755].)

Thus for purposes of determining the motion to strike, plaintiffs' cause of action for defamation arose no later than May 21, 2001, and had expired on May 22, 2002, when plaintiffs filed their complaint. (*See Firth v. State, supra,* 747 N.Y.S.2d at pp. 71–72.) Because the defamation claim was barred as a matter of law, it should have been stricken.[6]

II*

*Unfair Competition*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

Order reversed with directions that plaintiffs' defamation cause of action be stricken. Defendants to recover their costs of appeal.[8]

McIntyre, J., and Aaron, J., concurred.

---

[6] In light of our conclusions with respect to the statute of limitations, we do not reach defendants' contention that the statements on the Web site were protected by the privilege for fair and true reports of judicial proceedings appearing in public journals. (Civ. Code, § 47, subd. (d)(1).)

* See footnote, *ante*, page 392.

[8] On remand defendants may move to recover their reasonable attorney fees, including fees incurred on appeal, under section 425.16, subdivision (c).