Filed 2/3/16  LaChance v. Holt CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

|  |  |
|---|---|
| IRENE LACHANCE, | |
| Plaintiff and Respondent, | E062069 |
| v. | (Super.Ct.No. CIVDS1408373) |
| STEVEN HOLT, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County.  Joseph R. Brisco, Judge.  Reversed with directions.

Wagner & Pelayes, Tristan G. Pelayes and Mary C. Myers, for Defendant and Appellant.

Michael L. Gilmore for Plaintiff and Respondent.

Plaintiff and respondent Irene LaChance (plaintiff) sued defendant and appellant Steven Holt[1] (defendant) alleging six causes of action: defamation, intentional infliction of emotional distress, negligent infliction of emotional distress, intentional interference with prospective economic advantage, negligent interference with business relationships, and tortious interference with a contract. Plaintiff alleged that all of these injuries flowed from a single source: several allegedly defamatory statements about her in her capacity as the Labor Relations Representative (LRR) for California School Employees Association Local Chapter 183 for the San Bernardino Unified School District (Local 183) that defendant posted on Facebook. In response, defendant filed a special motion to strike the complaint as a strategic lawsuit against public participation (anti-SLAPP motion) pursuant to Code of Civil Procedure[2] section 425.16 (anti-SLAPP statute).

The trial court denied defendant's anti-SLAPP motion. Defendant appeals, contending the trial court erred in concluding that the statements were not protected under the anti-SLAPP statute because they were not connected with an issue of public interest. Plaintiff contends that the trial court properly found the statements concerned a "private transaction" not connected with an issue of public interest, and that there is a

_____

[1] Plaintiff also sued defendants Does 1 through 20, but for ease of discussion, we refer only to defendant.

[2] All further statutory references are to the Code of Civil Procedure unless otherwise noted.

2

probability plaintiff will prevail on her claims. We agree with defendant, disagree with plaintiff, and reverse the trial court's order denying defendant's anti-SLAPP motion.

FACTUAL AND PROCEDURAL BACKGROUND[3]

Sometime during the period of 2010 to 2014,[4] defendant served as the vice-president for Local 183. Local 183 was part of the California School Employees Association (CSEA), "the largest classified school employees union in the United States, representing more than 210,000 school support staff throughout California." The CSEA "thrive[s] as a member-run union," and is "democratically controlled by member volunteers in more than 750 local chapters throughout the state"; through the channels of "collective bargaining" and "political action," CSEA seeks to advance the "rights" of, and secure "benefits" for, its members. CSEA assigned plaintiff, an LRR, to represent and advance the interests of Local 183 by providing leadership in collective bargaining, organizing, political mobilizing, and other areas.

Declarations from officers and members of Local 183 indicate that the working relationship between Local 183 and plaintiff grew contentious. According to the declarations of three Local 183 officers, plaintiff was "constantly" absent from her duties to attend to personal hardships, but failed to notify Local 183 members and their officers.

---

[3] Plaintiff notes several paragraphs in defendant's underlying anti-SLAPP motion and defendant's opening brief that do not have "any evidentiary support in the record." For our background, we rely only on the information revealed in the pleadings, supporting declarations, and exhibits.

[4] The complaint and the declarations supporting the anti-SLAPP motion are short on specific dates.

3

As one of those officers declared, this tended to leave Local 183 at a disadvantage, because the membership received no assistance "[d]uring negotiations and furloughs." Another of Local 183's officers declared that "many" of Local 183's members complained that plaintiff "never resolved disputes" or "returned phone calls," and another declared that plaintiff "was known for raising her voice and making unwelcome remarks at Chapter meetings." A Local 183 member declared that, during the period of "2010 [to] 2014," she and other members were "scared" of plaintiff, and that "some schools even created a 'Charlie Door'[5] to keep [plaintiff] out of administrative buildings and offices." This last member further declared that plaintiff asked her to meet "secret[ly]" at a coffee shop to discuss her replacing defendant as Local 183's vice-president, and that she "resigned from [her] position in the union because [plaintiff] created dysfunction [and] chaos within the union." In a supplemental declaration, plaintiff generally denied, disputed, or offered competing explanations for these events.

Around May 2012, defendant allegedly posted the statements at issue on the public Facebook group "AEU and CSEA free chat."[6] According to the complaint and plaintiff's declaration in support, the posted statements read: plaintiff "is a crappy Labor Representative who likes to abandon her job and sell members down the river"; plaintiff "does not do justice to AEU's cause as she should not be paid at all for doing nothing but

---

[5] Plaintiff had the nickname "Charlie."

[6] The complaint also refers in passing to a blog where the statements may have been posted, but the only site mentioned in the trial court record with any specificity is the Facebook group.

4

sitting on her ass!"; and plaintiff "disappears from her chapter for months with no notice, conspires and has secret meetings with members to turn on other members and threatens to sue CSEA if they don't play ball with her." The parties did not submit copies of the actual statements, and neither party was able to provide a posting date more specific than "May of 2012."

On June 11, 2014, plaintiff filed the instant complaint against defendant. In her complaint, plaintiff alleged that defendant "published" the statements at issue "[o]n or about May 2012 and continuing to the present time." In relevant part, plaintiff alleged for each of her six causes of action that the allegedly defamatory statements were the direct and proximate cause of her injuries, due to the damage the statements inflicted on her reputation. Plaintiff also alleged that she was at all relevant times, and still is, a CSEA LRR in San Bernardino.

On July 24, 2014, defendant filed his anti-SLAPP motion. The motion argued in relevant part that the anti-SLAPP statute protected the statements at issue; they were written in a public forum on the internet and were connected with an issue of public interest in that they occurred in an ongoing discussion of an issue of interest to Local 183, "a limited, but definable portion of the public," and so were protected under subdivision (e)(3) of the anti-SLAPP statute.[7] The motion also argued in relevant part that plaintiff

_____

[7] Anti-SLAPP statute, subdivision (e), reads: "As used in this section, 'act in furtherance of a person's right of petition or free speech under the United States or California Constitution in connection with a public issue' includes: . . . (3) any written or oral statement or writing made in a place open to the public or a public forum in connection with an issue of public interest, . . ."

5

could not demonstrate a probability of prevailing on her claims, because the single publication rule[8] imposed a one-year statute of limitations that had run before plaintiff filed her complaint. Plaintiff filed an opposition, arguing in relevant part that the statements concerned a purely personal matter; they "attacked an individual" and did not meet the criteria for an issue of public interest. Plaintiff also argued that defendant's statute of limitations defense was meritless, because the complaint alleged that the statements at issue "continued to the present time," and that two of her causes of action had two-year statutes of limitations.

On September 17, 2014, the trial court adopted its tentative ruling denying defendant's anti-SLAPP motion. The trial court found that defendant's statements were made "on a public forum and were an exercise of free speech," but that defendant did not "submit[] any evidence with respect to when the statements were published on Facebook," and that "[d]efendant conceded [it was] unclear when the statements were published." The trial court thus concluded the statements "did not concern an ongoing public issue or controversy" and were "personal to [p]laintiff."

We will reverse with further instructions.

---

[8] As explained in greater detail below, the single publication rule codified at Civil Code section 3425.3 converts into one cause of action for defamation "any other tort founded upon any single [defamatory, mass] publication" and thus provides for a one-year statute of limitations.

STANDARD OF REVIEW

We review de novo an order denying an anti-SLAPP special motion to strike. (*Integrated Healthcare Holdings, Inc. v. Fitzgibbons* (2006) 140 Cal.App.4th 515, 521.)

DISCUSSION

The trial court's order indicates that it declined to find the statements at issue were connected with a matter of public interest primarily on the ground that it could not determine whether the statements formed part of a discussion that was then "ongoing" within Local 183. The trial court also declined to find the statements were connected with a matter of public interest because they were "personal" to plaintiff, which we take to mean the trial court found the statements attacked plaintiff in what was a personal, private dispute with defendant.

On appeal, both parties advance essentially the same key arguments described above. Defendant contends the trial court erred in finding the statements were a personal attack on plaintiff and were not connected with "the politics of the union's representation." Plaintiff contends simply that the trial court came to the proper findings and conclusions. We agree with defendant, and disagree with plaintiff.

1. *Step 1: "Issue of Public Interest" Requirement*

Subdivision (b)(1) of the anti-SLAPP statute calls for a two-step, summary judgment-like procedure when determining whether to grant an anti-SLAPP motion. (E.g., *Du Charme v. International Brotherhood of Electrical Workers* (2003) 110 Cal.App.4th 107, 111 (*Du Charme*).) Under the first step, the defendant has the burden

7

of making a prima facie showing that the acts of which the plaintiff complains were taken in furtherance of the defendant's rights of petition or free speech. These rights extend to any written statement made in a public forum "in connection with an issue of public interest." (§ 425.16, subd. (e)(3); see *Du Charme*, at p. 111.) "The Internet [provides] a classic public forum [within the meaning of subdivision (e)(3) of the anti-SLAPP statute] which permits an exchange of views in public about [nearly any subject matter]." (*Chaker v. Mateo* (2012) 209 Cal.App.4th 1138, 1146.)

Plaintiff does not dispute the trial court's finding that the statements at issue satisfied anti-SLAPP statute, subdivision (e)(3)'s initial "written in a public forum" element, because they were posted on a public Facebook group. That finding was correct.

### a. Du Charme *Factors*

However, defendant rightly disputes the trial court's finding that the statements did not satisfy subdivision (e)(3)'s "in connection with an issue of public interest" requirement. As relevant in this case, an issue must be: (1) "of interest"; (2) to "a limited, but definable portion of the public," such as a "private group, organization, or community"; and (3) the statements complained of must occur within an "ongoing . . . discussion" connected with that issue. (*Du Charme*, *supra*, 110 Cal.App.4th at p. 119.)

#### i. First Two Du Charme *Factors*

Here, the trial court's order did not indicate any reasons for denying defendant's anti-SLAPP motion based on the first two *Du Charme* factors, and we quickly explain

8

why the statements and the issues they concern satisfy these factors. First, the statements concerned how well plaintiff was representing Local 183's interests, which included the bargaining of their labor contracts, the advancement of their political and workplace goals, and the organization's governance; such issues would have been "of interest" to Local 183, because they would bear on the livelihood and working conditions of the members. Second, Local 183 is an organization for school employees in the San Bernardino Unified School District; it is a "limited" and "definable" portion of the public.

### ii. Third Du Charme Factor

The dispositive issue in this case is whether defendant's statements took place within an "ongoing" discussion about plaintiff's representation of Local 183 under the third *Du Charme* factor. *Du Charme* itself and *Hailstone v. Martinez* (2008) 169 Cal.App.4th 728 (*Hailstone*) are illustrative on this point.

In *Du Charme*, the plaintiff was an assistant business manager for the defendant union until he was terminated from that position following an investigation and independent financial audit. (*Du Charme*, *supra*, 110 Cal.App.4th at p. 113.) The defendant union then posted a statement on its Web site stating that the plaintiff's termination resulted from the plaintiff's "financial mismanagement" of union funds, precipitating the plaintiff's defamation suit and the defendant's anti-SLAPP motion, which was denied. (*Ibid.*)

On appeal, the court affirmed the denial, because the court found no evidence of an "ongoing" union discussion connected with the plaintiff's termination at the time the

9

defendant union posted the statement on the Web site. Instead, the court found that the plaintiff's termination was a "fait accompli" (*Du Charme*, *supra*, 110 Cal.App.4th at p. 118) and that the Web site statement concerning the termination was merely informational, because, in relevant part, the record did not demonstrate how the statement was connected with any union discussion of the plaintiff's management *before* the fact of his termination. (*Id.* at p. 114.)

In *Hailstone*, the plaintiff was a senior business agent for Teamsters Local Union No. 948. (*Hailstone*, *supra*, 169 Cal.App.4th at p. 732.) The defendant—Local 948's secretary-treasurer—suspended the plaintiff from his position for alleged " 'double dipping' " into union funds. (*Id.* at p. 733.) The defendant then spoke with others about the alleged double dipping, distributed a dated letter describing the double dipping accusations to various union officers and, finally, terminated the plaintiff as Local 948's business agent. (*Id.* at pp. 733-734.) This chain of events precipitated the plaintiff's defamation suit and the defendant's anti-SLAPP motion, which the trial court denied on the ground the defendant's oral and written statements were not connected with an issue of public interest. (*Id.* at p. 734.)

On appeal, the court affirmed the denial, but held, relying on *Du Charme*, that the trial court incorrectly concluded the statements complained of were not connected with an issue of public interest. (*Hailstone*, *supra*, 169 Cal.App.4th at pp. 737-738, 743.) Concerning *Du Charme's* ongoing discussion factor, *Hailstone* distinguished its otherwise factually-similar case from *Du Charme* on the ground that the defendant

published the oral and written statements at issue while the plaintiff, who played a leadership role in the union by serving in a "fiduciary capacity," was still a leader in the union—he had only been *suspended*, not yet *terminated*—and was still subject to investigation. (*Hailstone*, at p. 738.) In this way, the statements at issue in *Hailstone* were part of an ongoing discussion rather than merely informational, like the statements at issue in *Du Charme*.

Taken together, *Du Charme* and *Hailstone* stand for the proposition that *context* may provide sufficient indication that a particular discussion was ongoing when the complained of statements were made. Both cases involved statements concerning a union leader's performance of his or her duties that were subject to investigations. In *Du Charme*, the record revealed the statement at issue was published *after* the union leader had been terminated and the investigation concluded, whereas in *Hailstone*, the record revealed the statements at issue were published *while* the union leader was still, in a technical sense, a union leader and *could* perform the same duties that formed the subject of the investigation (or discussion). Both cases involved dated statements, but nothing in either case indicates precise dates are strictly necessary to the ongoing determination. Thus, in the instant case involving defendant's statements about plaintiff fulfilling a union leadership role, the key consideration in determining whether defendant has met his prima facie burden of establishing an ongoing discussion is whether the record reveals defendant published the statements during the time plaintiff was still

11

employed with the union, and performing the same union leadership duties subject to discussion.

Here, the record contains evidence showing that defendant has satisfied his prima facie burden of establishing an ongoing discussion. The declarations show that Local 183 members discussed concerns with one another and with officers across the time plaintiff represented the organization—there were complaints that plaintiff was "constantly absent from her duties as labor relations representative," that plaintiff "never resolved disputes or returned phone calls," and that plaintiff "was known for raising her voice and making unwelcome remarks" at meetings. One declaration further describes how, in the period "from 2010 [to] 2014," members felt "scared" of plaintiff, and that these individual concerns rose to such a level of collective, *enduring* concern that a special door was designated for plaintiff in certain buildings and offices during the same period, which would indicate that plaintiff's performance of her leadership duties as an LRR were then subject to discussion during that period. In the middle of this period—around May 2012, according to plaintiff's complaint—defendant posted the statements at issue. The statements at issue *also* concern plaintiff's absences and the performance of her LRR duties. Based on the declarations and plaintiff's complaint, plaintiff was employed as an LRR at the time the statements were posted, and thus was performing the same duties subject to discussion. Moreover, the statements are written in the present tense, which *further* indicates their connection with a contemporaneous discussion. Thus, there is prima facie evidence in the record showing defendant's published statements occurred in

12

the context of an ongoing discussion because, as in *Hailstone*, they were published while plaintiff was employed in a leadership role in the union and performing the same duties that were subject to discussion among Local 183's members.

The trial court erred in finding that defendant did not meet his burden of showing an ongoing discussion on the ground that defendant conceded it was unclear when the statements were posted. The trial court was concerned with being able to identify whether any discussion about plaintiff's LRR representation had died down—and had become a *Du Charme*-like fait accompli—by the time defendant posted the statements at issue. As our discussion *ante* illustrates, it is only a prima facie burden the defendant must satisfy, and it may be satisfied by providing evidence bearing the hallmarks discussed in *Hailstone*, which defendant did here by submitting declarations from Local 183 members and officers revealing the time frame and events discussed *ante*.[9] In this way, defendant was not transparent about the timing of the statements, but he was just clear enough. As our discussion *ante* further illustrates, the record in this case also shows additional evidence of an ongoing discussion: not only do the statements at issue address the *same* concerns with plaintiff's representation that are revealed in the declarations, but the statements *also* are written in the present tense. It would not make sense for defendant to use the present tense in discussing those exact concerns if the events giving

---

[9] Though not necessary, we add that the burden is a prima facie one for good reason: the anti-SLAPP was designed to screen against frivolous lawsuits (§ 425.16, subd. (a)), which, by their very nature, often are short on details and on context such that a defendant does not know what precisely it is that he is defending against.

rise to them were not occurring and being discussed among Local 183's members and officers around the same time defendant posted the statements.

### iii. *Whether the Statements were "Personal" to Plaintiff*

Concerning the trial court's other ground for denying defendant's anti-SLAPP motion, namely, that the statements were personal to plaintiff and therefore did not constitute an issue of public interest, it is true that the statements were of a personal *nature* to plaintiff in that they directly criticized how she may have been performing her LRR duties. However, what distinguishes the statements here from a *purely* private, personal attack *not* protected by the anti-SLAPP statute is the representative capacity— the leadership role—plaintiff fulfilled as an LRR on behalf of CSEA for an entire organization, Local 183. In such a role, plaintiff undertook activities potentially impacting the livelihoods of all of Local 183's members and officers, and so, as our discussion *ante* illustrates, her fitness for those activities would be of interest to the organization, taking the statements at issue outside the realm of a merely personal, or private, dispute.

### iv. Plaintiff's Contentions

Finally, concerning plaintiff's contentions, she recites the factors to be considered in determining whether an issue is of public interest as set forth in *Olaes v. Nationwide Mutual Ins. Co.* (2006) 135 Cal.App.4th 1501, but then asserts in conclusory fashion only that the statements at issue do not fulfill those factors. As our discussion above illustrates, the statements at issue fulfill the public interest analysis for limited sections of

14

the public established in *Du Charme*, *supra*, 110 Cal.App.4th 107.  (See, e.g., *Berger v. California Ins. Guarantee Assn.* (2005) 128 Cal.App.4th 989, 1007 [an appellate court need not discuss issues raised in briefs unsupported by legal argument].)

In sum, defendant made a prima facie showing that the statements here addressed, as part of an ongoing discussion, an issue of interest to a limited, definable portion of the public—the union representation plaintiff was providing at the time to the Local 183 organization.  Thus, the statements were connected with "an issue of public interest" under subdivision (e)(3) of the anti-SLAPP statute.[10]

2.  *Step 2:  Reasonable Probability of Prevailing*

If the defendant satisfies the threshold burden under step 1, then the burden shifts to the plaintiff under step 2 to show a reasonable probability of prevailing on the merits of her claims.  (*Du Charme*, *supra*, 110 Cal.App.4th at p. 112, citing § 425.16, subd. (b)(1).)  The trial court in this case did not reach step 2 because it denied the anti-SLAPP motion at step 1.  Thus, we initially consider whether to reach step 2 ourselves, or to remand the case to the trial court so that it may initially consider step 2.

i.  *Whether to Address Step 2 Ourselves or Remand to Trial Court*

An appellate court has discretion either to consider step 2 in the first instance or to remand a case to a trial court for it to consider step 2 in the first instance.  (*Wallace v.*

---

[10] Because defendant met his burden by showing the statements at issue occurred in an ongoing discussion about plaintiff's overall fitness as Local 183's LRR, we do not reach his arguments that the statements occurred in an ongoing decertification controversy, that plaintiff's duties affected the larger San Bernardino community, or that plaintiff was a limited purpose public figure.

15

*McCubbin* (2011) 196 Cal.App.4th 1169, 1195.) Where a plaintiff's probability of success on *any part* of her claim hinges on a question of *fact* that requires the resolution of unresolved evidentiary matters, it is appropriate to remand the case to the trial court for it to consider step 2 in the first instance. (See *Birkner v. Lam* (2007) 156 Cal.App.4th 275, 286 [remanding case to trial court to consider step 2 in the first instance because the plaintiff's probability of success under the litigation privilege hinged on the trial court's ruling on unresolved evidentiary objections].) Thus, it stands to reason that where a plaintiff's probability of success on her *entire* claim hinges on a question of *law* that an appellate court may fully resolve by reviewing in the light most favorable to the plaintiff the uncontroverted evidence already adduced in the trial court, it is appropriate for the appellate court to consider step 2 in the first instance. In this case, plaintiff's probability of success on her entire claim hinges entirely upon questions of law—namely, whether the single publication rule applies to her case, which in turn depends on interpreting her complaint—and so we consider step 2 in the first instance.

### ii. *Evaluating Plaintiff's Probability of Prevailing*

On appeal, plaintiff argues in conclusory fashion that "the evidence and pleadings" demonstrate she can satisfy all of the necessary elements on each of her causes of action. We disagree.

The plaintiff must adduce competent, admissible evidence demonstrating " ' " 'that the complaint is both legally sufficient and supported by a sufficient prima facie showing of facts' " ' " (*Hailstone*, *supra*, 169 Cal.App.4th at p. 735), which

16

includes showing the action's "timeliness" in the face of a statute of limitations defense (*Traditional Cat Assn., Inc. v. Gilbreath* (2004) 118 Cal.App.4th 392, 398-399 (*Gilbreath*)).

Concerning a statute of limitations defense based on the single publication rule, the rule is codified: "No person shall have more than one cause of action for damages for libel or slander or invasion of privacy or any other tort founded upon any single publication or exhibition or utterance [in mass communications]." (Civ. Code, § 3425.3.) Thus, if a plaintiff alleges multiple torts that arise from reputational injuries caused by an allegedly defamatory, mass publication, then the rule applies, and the one-year statute of limitations begins to run from the date of publication. (See *Strick v. Superior Court* (1983) 143 Cal.App.3d 916, 922-923 [discussing the rule's application to causes of action for negligence, fraud, and deceit when, in substance, they are actions for defamation]; see also *Gilbreath*, *supra*, 118 Cal.App.4th at p. 404 [applying the rule to statements on the internet].)

Plaintiff cannot meet her burden of showing a reasonable probability of prevailing on the merits of her claim under step 2 because the causes of action forming her claim fall within the scope of the single publication rule, and her claim thus expired one year after the statements at issue were published. All of plaintiff's six causes of action sounded in tort, and they all alleged that the statements posted publicly on Facebook formed the direct and proximate cause of her various injuries; thus, the six causes of action were "tort[s] founded upon [a] single [defamatory, mass] publication." (Civ.

17

Code, § 3425.3.) The complaint alleges the statements were posted around May 2012, but plaintiff did not file the current action until June 11, 2014, by which time the one-year statute of limitations had run.

Plaintiff's contention in the trial court that the statute of limitations commenced on the date the complaint either was drafted or filed because the complaint alleged the publication of the statements "continu[ed] to the present time" does not avail her here. That same argument has been rejected before, because internet posts, unless *reposted* (and thus *repeated*), are one-time publications that are not continuously *republished* simply by virtue of being on the internet. (See *Gilbreath*, *supra*, 118 Cal.App.4th at pp. 395, 399 [rejecting the plaintiffs' contention that their action for defamation "arose continuously" while the Web site where the statements were posted was operating].)[11]

Finally, plaintiff's contention in the trial court that longer statutes of limitations apply for some of her causes of action also has been rejected before in light of the single publication rule. (See, e.g., *Long v. Walt Disney Co.* (2004) 116 Cal.App.4th 868, 872-874 [holding under the single publication rule that the plaintiffs could not circumvent statutory limitations by proceeding on theories other than defamation, where their causes of action, including intentional infliction of emotional distress, arose from allegedly defamatory broadcasts and related internet activity].) Plaintiff showed only that the

---

[11] To the extent this phrasing may be interpreted to mean that defendant *repeated* the statements by reposting them on separate occasions, not only is the phrasing an awkward and imprecise way to express the concept, but also—and most importantly—the complaint fails to separately set forth the dates, locations, or circumstances of any other reposts of the statements. These considerations lead us to reject that interpretation.

statements were posted around May 2012, which was insufficient here to defeat the one-year statute of limitations under the single publication rule.

In sum, plaintiff's six causes of action became one cause of action for defamation under the single publication rule. Based on plaintiff's complaint and her supporting declaration, her cause of action arose no later than May 31, 2012, and expired on May 31, 2013. Because plaintiff's cause of action was barred as a matter of law when she filed her complaint on June 11, 2014, she cannot show a reasonable probability of prevailing on the merits.

## DISPOSITION

The order denying defendant's anti-SLAPP motion is reversed with instructions to enter an order granting the motion and to hold a hearing for awarding defendant the attorney fees to which he is entitled under subdivision (c) of the anti-SLAPP statute.

Defendant and appellant is awarded his costs on appeal.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

RAMIREZ _____
P. J.

We concur:

McKINSTER _____
J.

CODRINGTON _____
J.

19