28 Cal.Rptr.3d 515 (2005)
HEBREW ACADEMY OF SAN FRANCISCO et al., Plaintiffs and Appellants,
v.
Richard N. GOLDMAN et al., Defendants and Respondents.
No. A106618.
Court of Appeal, First District, Division Two.
May 12, 2005.
Review Granted August 24, 2005.
*516 Paul Kleven, Berkeley, Law Office of Paul Kleven, Attorneys for Appellants.
Michael C. Cooper, Carlson, Calladine & Peterson LLP, Barry W. Lee, San Francisco, Steefel, Levitt & Weiss, Attorneys for Respondents.
KLINE, P.J.
Appellants Hebrew Academy of San Francisco and Rabbi Pinchas Lipner (founder and dean of the Hebrew Academy) appeal from the trial court's grant of summary judgment in favor of respondents Richard N. Goldman, The Jewish Community Federation of San Francisco, the Peninsula, Marin and Sonoma Counties (Federation), and the San Francisco Jewish Community Endowment Fund (Endowment Fund). The trial court granted summary judgment for respondents, determining that appellants' defamation action *517 was barred by the one-year limitations period applicable to causes of action for libel or slander under then Code of Civil Procedure section 340, subdivision (3).[1]
The questions presented are (1) whether communication of the alleged defamation is subject to the single-publication rule and, if not, (2) whether appellants' cause of action for defamation should be tolled under the doctrine of delayed discovery, because the alleged libel was hidden or beyond what the ordinary person could be expected to immediately detect or comprehend.
Answering no to the first question and yes to the second, we shall reverse the judgment.

FACTS AND PROCEEDINGS BELOW
In 1990, in order to document Jewish philanthropy in the San Francisco Bay Area during the past half century, the Federation and the Endowment Fund provided $60,000 to fund edited interviews or "oral histories" of 15 past presidents of the Federation, one of whom was respondent Goldman. The project, known as the Jewish Community Federation Leadership Oral History Project, was carried out by the Regional Oral History Office (ROHO), a research program of the Bancroft Library located on the campus of the University of California at Berkeley. Elizabeth Glaser, an employee of ROHO, conducted four interviews of Goldman in 1992. After Goldman reviewed the transcript of the interviews and made a substantial number of changes, the edited interviews were bound in a single volume. Exclusive of introductory statements and a biographical sketch of Goldman, the volume consisted of a 102-page typewritten transcript of Glaser's four interviews of Goldman (hereafter the Goldman oral history). The copyrighted document was published by ROHO in 1993, when copies were placed in the Bancroft Library and the Charles E. Young Research Library at UCLA. As we shall later discuss in greater detail, the document was thereafter made available to other libraries and included in certain Internet databases and online catalogues.
In one of his interviews, responding to questions from Glaser about appellants and their role in the San Francisco Bay Area Jewish community, Goldman criticized the Hebrew Academy, the manner in which Rabbi Lipner treated students and the financial drain on the Jewish community caused by the Federation's support of the school, and alleged that Lipner had been "run out of other communities before he got here."
In 2001, eight years after publication of the Goldman oral history, Miriam Real undertook research preparatory to writing "a historical book about [Rabbi Lipner] and the Hebrew Academy, and, by extension the story of Orthodox Judaism in San Francisco." Because she had once been employed by ROHO, Real was aware it had undertaken a series of interviews with past presidents of the Federation, and thought the transcripts might contain useful information. Oral histories could not be removed from the library and were kept in stacks to which the public was denied access. Real searched the card catalogue for potentially useful oral histories and asked that several be retrieved from the stacks. After reviewing the indices of these histories for subjects relevant to her research, Real filled out a form requesting that specified pages of certain *518 oral histories, including that of respondent Goldman, be copied and mailed to her. Library users were not permitted to themselves make copies and Real was unwilling to wait the several hours it would have taken for the copies to be made. Several weeks later, when she read the materials mailed to her, Real discovered Goldman's allegedly defamatory statements and sent them to Rabbi Lipner.
Lipner filed a declaration alleging that, prior to receiving the two pages of the Goldman oral history from Real, "I did not know, and could not with reasonable diligence have known, that defendants had published such statements, in that the transcripts were never distributed to the general public, but were available only in a few locations. I did not have access to the Federation offices, where I am informed and believe a copy of the transcript was kept, and did not know of the transcript's existence at any location."
On November 18, 2002, appellants filed their original complaint against respondents, alleging both defamation and placing appellants in a "false light." On December 19, 2002, appellants filed a first amended complaint, which added the Regents of the University of California (Regents) and the Bancroft Library as defendants, as well as the allegation that appellants "did not know, and could not with reasonable diligence have known, that defendants were publishing such statements."
On January 23, 2003, respondents demurred to the first amended complaint. The trial court sustained the demurrer, but gave appellants leave to amend to plead specific facts regarding discovery and publication of the allegedly defamatory statements.[2]
On March 13, 2003, appellants' second amended complaint was filed, to which respondents also demurred on grounds of the statute of limitations. The demurrers were overruled and the Federation and other defendants answered the complaint. Later in 2003, codefendants Regents and the Bancroft Library filed a special motion to strike the second amended complaint as to them under the anti-SLAPP statute[3] (§ 425.16), which the court granted on the ground that appellants could not establish a probability of success because of the bar of the statute of limitations.
Evidently spurred by this ruling, respondents moved for summary judgment on November 20, 2003, on the ground, among others, of the bar of the statute of limitations. The trial court granted the motion on March 11, 2004, holding that appellants' action was barred by section 340, subdivision (3). The order stated that "undisputed material facts establish that the `rule of discovery' asserted by plaintiffs in an attempt to toll the statute of limitations does not apply in this action." Judgment in favor of respondents was entered on March 25, 2004, after which appellants filed this timely appeal.

DISCUSSION

I.
When reviewing a grant of summary judgment, we make "an independent assessment of the correctness of the trial court's ruling, applying the same legal standard as the trial court in determining whether there are any genuine issues of *519 material fact or whether the moving party is entitled to judgment as a matter of law. [Citations.]" (Iverson v. Muroc Unified School Dist. (1995) 32 Cal.App.4th 218, 222-223, 38 Cal.Rptr.2d 35.) We strictly construe the moving party's evidence, liberally construe that of the opposing party, and resolve any "evidentiary doubts or ambiguities" in favor of the opposing party. (Saelzler v. Advanced Group 400 (2001) 25 Cal.4th 763, 768, 107 Cal.Rptr.2d 617, 23 P.3d 1143.)
Section 437c, subdivision (e), provides that a "motion for summary judgment shall be granted if all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." We will affirm if there is no triable issue of fact and if respondents are entitled to judgment under any theory of law applicable to the case, including but not limited to the theory adopted by the trial court. (Western Mutual Ins. Co. v. Yamamoto (1994) 29 Cal.App.4th 1474, 1481, 35 Cal.Rptr.2d 698.)

II.
As recently explained by the Supreme Court in Shively v. Bozanich (2003) 31 Cal.4th 1230, 7 Cal.Rptr.3d 576, 80 P.3d 676 (Shively), the single-publication rule addresses the difficulty in identifying the publication or publications that may give rise to a cause of action for defamation. Under the early common law rule, "each communication of a defamatory remark to a new audience constitute[d] a separate `publication,' giving rise to a separate cause of action, led to the conclusion that each sale or delivery of a copy of a newspaper or book containing a defamation also constitutes a separate publication of the defamation to a new audience, giving rise to a separate cause of action for defamation. [Citations.] This conclusion had the potential to subject the publishers of books and newspapers to lawsuits stating hundreds, thousands, or even millions of causes of action for a single issue of a periodical or edition of a book.... The statute of limitations could be tolled indefinitely, perhaps forever, under this approach." (Id. at pp. 1243-1244, 7 Cal. Rptr.3d 576, 80 P.3d 676.) Ultimately, American courts "recognized that the advent of books and newspapers that were circulated among a mass readership threatened unending and potentially ruinous liability as well as overwhelming (and endless) litigation, as long as courts adhered to the rule that each sale of a copy of a newspaper or a book, regardless how long after original publication, constituted a new and separate publication." (Ibid.)
In order to avoid the problem, "courts fashioned what became known as the single-publication rule, holding that, for any single edition of a newspaper or book, there was but a single potential action for a defamatory statement contained in the newspaper or book, no matter how many copies of the newspaper or book were distributed. [Citations.]" (Shively, supra, 31 Cal.4th at p. 1245, 7 Cal.Rptr.3d 576, 80 P.3d 676.) "Under the single-publication rule, with respect to the statute of limitations, publication generally is said to occur on the `first general distribution of the publication to the public.' [Citations.]" (Ibid.) The single-publication rule was codified in California in 1955. As material, Civil Code section 3425.3 now provides: "No person shall have more than one cause of action for damages for libel or slander or invasion of privacy or any other tort founded upon any single publication or exhibition or utterance, such as any one issue of a newspaper or book or magazine or any one presentation to an audience or any one broadcast over radio or television or any one exhibition of a motion picture." *520 Like the case law, the statute is confined to communications in the mass media.
Shively makes clear that application of the single-publication rule has invariably been confined to newspapers and books. (Shively, supra, 31 Cal.4th at p. 1245, 7 Cal.Rptr.3d 576, 80 P.3d 676.)[4] In a footnote, the court observed that "applicability of the single-publication rule to written publications that receive an extremely limited distribution is not an issue in [this] case." (Id. at p. 1245, fn. 6, 7 Cal.Rptr.3d 576, 80 P.3d 676.) Respondents acknowledge the Goldman oral history is not a book, but deny it received "an extremely limited distribution." According to respondents, not only has the document "been available nationally through hundreds of libraries for more than a decade," but it has also been made available on the Internet. Citing Traditional Cat Assn., Inc. v. Gilbreath (2004) 118 Cal.App.4th 392, 13 Cal.Rptr.3d 353 and Firth v. State (2002) 98 N.Y.2d 365, 747 N.Y.S.2d 69, 775 N.E.2d 463, respondents point out that the single-publication rule applies to postings on Internet Web sites. In respondents' view, the regnant factor in this case, which compels application of the single-publication rule, is that the basis for appellants' libel claims was as "available to [Rabbi Lipner] as it is to the general public."
We disagree with respondents' characterization of the facts as well as their concept of the single-publication rule.
Though ROHO and the Bancroft Library make copies of the Goldman oral history "available" to other libraries, the record establishes that only two, the New York Public Library and the Charles E. Young Research Library at UCLA, ever requested or were actually provided a copy. The record does not indicate whether the New York Public Library makes the document generally available to the public or whether any user of that library has ever requested a copy. Like the Bancroft Library, the Charles E. Young Research Library is not unrestrictedly open to the general public.[5] Putting aside the copies of the oral history purchased by Goldman and the Federation, which are not shown to ever have been made available to the general public, no more than 10 copies of the transcript exist. Nine are held by the Bancroft Library, ROHO or its employees (3 copies), the Charles E. Young Research Library (1 copy), the New York Public Library (2 copies), the Magnus Museum in Berkeley (2 copies), and Temple Emanu-El in San Francisco (1 copy). The record does not establish that any of these institutions made the Goldman oral history available to the public without restriction, or provided a copy to any member of the public. The remaining copy was purchased from ROHO by an individual residing in Washington D.C., the only member of the public other than Goldman known to have acquired a copy during the 10 years it was "available" to the public. The only person known to have requested a copy of any portion of the transcript from any source is Miriam Real.
No case holds, and the purpose of the single-publication rule does not suggest, *521 that a communication not published in a book, newspaper or magazine and not directed to a mass readership is subject to the rule simply because it is held in a library or otherwise theoretically "available" to a member of the public who may know of its existence.
Respondents' claim that ROHO's oral histories, including that of Goldman, are available on the Internet is unsupported by the record. The Goldman oral history was catalogued on two library databases, Research Libraries Information Network (RLIN), and the Online Computer Library Center (OCLC), and on the University of California's online catalogues, MELVYL and GLADIS/Pathfinder. However, none of the references to the Goldman oral history on these Internet databases and catalogues make any mention of Rabbi Lipner or the Hebrew Academy. The RLIN and OCLC databases state that the subject of the Goldman oral history is "Goldman, Richard N." and reveal only that it consists of "interviews" pertaining to the "Jewish Community Federation of San Francisco, the Peninsula, Marin and Sonoma Counties." The MELVYL and GLADIS/Pathfinder catalogues, which each state that Goldman's oral history "is made available for research purposes only," reveal only that Goldman "discusses family background; Jewish Welfare Federation; Jewish Community Federation; influencing changes in the United Jewish Appeal and the Jewish Agency; Jewish Endowment Fund; activities on behalf of Israel and other political activities." Had Rabbi Lipner been aware of and consulted the databases and online catalogues just described, he would not have learned the factual basis for his defamation claim, nor anything that might have justified a suspicion of injury warranting further investigation.
Most significantly, no online database or catalogue, and no Internet Web site brought to our attention, has ever reproduced the Goldman oral history or any portion of the transcript. For this reason, Traditional Cat Assn., Inc. v. Gilbreath, supra, 118 Cal.App.4th 392, 13 Cal.Rptr.3d 353 and Firth v. State, supra, 98 N.Y.2d 365, 747 N.Y.S.2d 69, 775 N.E.2d 463, cited by respondents for the proposition that the single-publication rule applies to Internet communications, are inapposite. In those cases the defamatory publications were not merely referred to but posted on Internet Web sites. Prior to the filing of this lawsuit, no general Internet search of the names of Rabbi Lipner, the Hebrew Academy, or Goldman would disclose any online reference to Goldman's allegedly defamatory statements, let alone the statements themselves, anywhere on the Internet.
We conclude that the single-publication rule does not apply to the Goldman oral history. The parties agree that there has been but one publication of the alleged defamation, and thus but one tort, and that it occurred in 1993 when the Goldman oral history was published and the statute of limitations commenced to run. Respondents have not shown they are in need of protection from a multiplicity of suits, or from a continuous tolling of the statute of limitations, or from the application of diverse laws to a single event, which are the problems the rule was designed to solve. (Edwards v. Associated Press (5th Cir.1975) 512 F.2d 258, 264-265, fn. 19, citing Prosser, Law of Torts (4th ed.1971) § 113, pp. 766-776.) This case thus presents no need for the rule. Application of the single-publication rule in this case, which would have the effect of barring judicial inquiry whether appellants were sufficiently diligent to discover the basis for their claims, would serve no legitimate purpose.
Because the single-publication rule does not apply to the Goldman oral history, we proceed to consider whether the discovery *522 rule applies to preserve appellants' causes of action.

III.
The discovery rule constitutes an equitable exception to general legal rules concerning the accrual of a cause of action, such as the single-publication rule. As noted in Shively, supra, 31 Cal.4th 1230, 7 Cal.Rptr.3d 576, 80 P.3d 676, "in some instances, the accrual of a cause of action in tort is delayed until the plaintiff discovered (or reasonably should have discovered or suspected) the factual basis for his or her claim. [Citation.] ... [T]he discovery rule most frequently applies when it is particularly difficult for the plaintiff to observe or understand the breach of duty, or when the injury itself (or its cause) is hidden or beyond what the ordinary person could be expected to understand. [Citations.]" (Id. at p. 1248, 7 Cal.Rptr.3d 576, 80 P.3d 676.)
The plaintiff in Shively was a potential witness in a high-profile murder case whose complaint contained causes of action for defamation against the author of a book and other defendants for the allegedly libelous statement in the book that she was a felony probationer. The plaintiff claimed her causes of action accrued when she bought and read a copy of the book after it was widely distributed and sold in California. The trial court sustained demurrers as to the causes of action on the ground, among others, that the statement had been made more than one year prior to the filing of the complaint. The Court of Appeal reversed, finding that the trial court had failed to consider whether the discovery rule had tolled the accrual of the plaintiff's causes of action.
The Supreme Court reversed the judgment of the Court of Appeal, holding that the discovery rule could not be employed to delay the accrual of the causes of action for defamation beyond the point at which the defamation was no longer secret but was made public in a book. More than a year prior to the filing of the complaint, 33,000 copies of the book had been shipped for distribution, and thousands were available for sale in California. Because the defamation was published in a widely distributed book and not hidden from view, the court concluded it was unnecessary to address the plaintiff's contention that, because she had been a reasonably diligent litigant, her delay in filing the complaint was justified under the doctrine of delayed discovery. Although application of the discovery rule may be justified when the defamation was communicated "`in an inherently secretive manner,'" the court explained, "the justification does not apply when the defamation occurred by means of a book, magazine or newspaper that was distributed to the public." (Shively, supra, 31 Cal.4th at pp. 1250-1251, 7 Cal.Rptr.3d 576, 80 P.3d 676, citing McGuiness v. Motor Trend Magazine (1982) 129 Cal.App.3d 59, 63, 180 Cal.Rptr. 784.)
The discovery rule cannot apply "to libels published in books, magazines, and newspapers," because application of that rule to mass communications "would undermine the protection provided [for in] the single-publication rule. [Citations.]" (Shively, supra, 31 Cal.4th at p. 1250, 7 Cal.Rptr.3d 576, 80 P.3d 676.) The law does not consider it unfair to refuse application of the discovery rule in cases in which the libel is published in "books, magazines and newspapers," because, when it is contained in the mass media, "the plaintiff may be expected to be sufficiently diligent to discover the basis for his or her claim within the statutory period." (Id. at p. 1248, 7 Cal.Rptr.3d 576, 80 P.3d 676.) It is only in situations to which the single-publication rule clearly does not apply that the discovery rule may apply, if it can be *523 shown that the non-mass media defamation at issue "has been kept in a place to which the plaintiff has no access or cause to seek access" (id. at p. 1249, 7 Cal.Rptr.3d 576, 80 P.3d 676), and it would therefore be unjust to hold that his or her cause of action accrued, and the cause of action commenced, when the publication was first secreted in such a place.
The discovery rule should not be applied to a non-mass media communication when the alleged defamation received some other form of publicity constituting "`"notice or information of circumstances to put a reasonable person on inquiry."'" (Jolly v. Eli Lilly & Co. (1988) 44 Cal.3d 1103, 1110-1111, 245 Cal.Rptr. 658, 751 P.2d 923, quoting Gutierrez v. Mofid (1985) 39 Cal.3d 892, at pp. 896-897, 218 Cal.Rptr. 313, 705 P.2d 886, quoting Sanchez v. South Hoover Hospital (1976) 18 Cal.3d 93, 101, 132 Cal.Rptr. 657, 553 P.2d 1129, italics added by the Gutierrez court.) In those circumstances, "the plaintiff may be expected to be sufficiently diligent to discover the basis for his or her claim within the statutory period" (Shively, supra, 31 Cal.4th at p. 1248, 7 Cal.Rptr.3d 576, 80 P.3d 676), and be said to have had constructive and presumed notice or knowledge of the defamation. (McKelvey v. Boeing North American, Inc. (1999) 74 Cal.App.4th 151, 160-161, fn. 11, 86 Cal.Rptr.2d 645, cited with approval in Shively, at p. 1248, 7 Cal.Rptr.3d 576, 80 P.3d 676.)
Respondents' claim that appellants have failed "to offer any plausible explanation for their incuriosity" is indifferent to the absence of any reason appellants should have been "curious" whether Goldman had made wrongful statements about them in an oral history.[6] Respondents' contention that the discovery rule does not apply rests on the same theory of availability that underlies their contention that the single-publication rule applies, but with a twist. According to respondents, the fact that the Goldman oral history was as "available" to appellants as it is to the general public is enough to support the expectation that it would or at least could have been discovered within the statutory period through the exercise of reasonable diligence. But that is not the law. As we have said, the law's expectation that reasonable diligence will result in timely discovery of the basis for a libel claim comes into play only when the basis for the claim has been widely distributed in the public record or otherwise the subject of publicity. (Shively, supra, 31 Cal.4th at p. 1248, 7 Cal.Rptr.3d 576, 80 P.3d 676.) Respondent's argument  which is not much more than the assertion that the existence of a factual basis for a libel claim that could possibly have been discovered, even if it did not appear in a mass communication, is enough to impose on the plaintiff the responsibility to diligently endeavor to discover it  cannot be accepted without adopting the radical view, for which there is no legal support, that the doctrine of *524 delayed discovery cannot be applied in a defamation action.
As we see it, the discovery rule applies in this case if the factual basis for appellants' libel claims was so hidden from public view that reasonable diligence would not have led to its discovery within the statutory period. We believe the basis for appellants' claims was so hidden.
It is of particular significance that oral histories are not primarily designed for immediate public attention. Willa K. Baum, the director of ROHO and a leading authority on oral history, is the author of several treatises on the subject. Her major treatise, which was received in evidence by the trial court, states on its first page that "[o]ral history interviews differ from journalistic or specific historical research interviews in that they are intended for use in the future by a wide variety of researchers; therefore their scope should be broader than what would be covered for immediate or specific use. A plan of preservation and use is essential to oral history. (Baum, Oral History for the Local Historical Society (3d ed.1995) at p. 1, italics added.) Oral histories, which are invariably preserved in archives, such as those maintained by the Bancroft Library and the Charles E. Young Research Library, rarely receive any significant amount of public attention until and unless they are used by an historian or journalist as source material for a book, magazine, newspaper, radio or television program or some other form of mass communication. The Goldman oral history has never been used for any such purpose. It is therefore not surprising that at a deposition in 2004, more than 10 years after publication of his oral history, Goldman was unable to say anyone had ever told him he or she had read any portion of his oral history. When asked whether he was "aware of any means by which Rabbi Lipner would have been aware that you had made these statements about him?" Goldman responded: "Obviously not."
Respondents maintain that the discovery rule should be applied sparingly, only in "rare cases in which the libelous communication occurred in private or in secret." The view that the discovery rule should be applied with restraint and only rarely is not shared by the courts. As appellate courts have frequently observed, "`there appears to be a definite trend toward the discovery rule and away from the strict rule in respect of the time for the accrual of the [Code Civ. Proc., § 340, subd. (3)] cause of action for personal injuries.'" (Cain v. State Farm Mut. Auto. Ins. Co. (1976) 62 Cal.App.3d 310, 314, 132 Cal.Rptr. 860, quoting Warrington v. Charles Pfizer & Co. (1969) 274 Cal.App.2d 564, 567, 80 Cal.Rptr. 130; accord, Saliter v. Pierce Brothers Mortuaries (1978) 81 Cal.App.3d 292, 297, 146 Cal.Rptr. 271 ["There appears to be a strong trend toward application of the discovery rule to personal injuries actions"]; Manguso v. Oceanside Unified School Dist. (1979) 88 Cal.App.3d 725, 728, 152 Cal.Rptr. 27.) As the Illinois Supreme Court observed in Tom Olesker's Exciting World of Fashion v. Dun & Bradstreet (1975) 61 Ill.2d 129, 334 N.E.2d 160, too sparing application of the discovery rule "`often brings "obvious and flagrant injustice."'" (Id. at p. 134, 334 N.E.2d 160, quoting Prosser, Law of Torts (3d ed.1964) § 30.)
Application of the discovery rule in appropriate cases does not frustrate the policies that underlie the applicable statute of limitations. "`"The underlying purpose of statutes of limitation is to prevent the unexpected enforcement of stale claims concerning which persons interested have been thrown off their guard by want of prosecution.' [Citations.]" If the plaintiffs' allegations of lack of knowledge are *525 sustained they cannot be accused of being neglectful of their rights or of using reasonable and proper diligence to enforce them. It is not the policy of the law to unjustly deprive one of his remedy.'" (Manguso v. Oceanside Unified School Dist., supra, 88 Cal.App.3d at p. 730, 152 Cal.Rptr. 27.)
Respondents rely upon three cases to show that application of the discovery rule is proper only in cases in which the libelous communication was more inherently undiscoverable than that here. The cases do not, however, support the proposition.
The first two cases, Manguso v. Oceanside Unified School Dist., supra, 88 Cal.App.3d 725, 152 Cal.Rptr. 27 and Staheli v. Smith (Miss.1989) 548 So.2d 1299, involved libels contained in confidential communications placed in personnel files. In Manguso, "the letter was read by or to Manguso's prospective employers and agents, with the result Manguso was unable to obtain employment as an elementary school teacher...." (Manguso, at p. 727, 152 Cal.Rptr. 27) In Staheli, a university dean placed two strongly worded letters recommending denial of tenure to the plaintiff in the confidential file considered by other members of the faculty committee involved in the decision, who voted to deny tenure. (Staheli, at p. 1301.) In both cases the allegedly defamatory statement was intended to be immediately read by others, and was, and this had consequences that soon became known to the plaintiffs. Unlike Manguso and Staheli, no one (other than the parties and Miriam Real) is known to have read the defamation alleged in this case and, as a result, appellants did not suffer consequences that might have put them on notice.[7] Appellants therefore had less reason to suspect they had been defamed and to make further inquiry than the plaintiffs in Manguso and Staheli.
Respondents also rely on Tom Olesker's Exciting World of Fashion v. Dun & Bradstreet, supra, 61 Ill.2d 129, 334 N.E.2d 160, in which the plaintiff charged that the defendant maliciously published an allegedly libelous credit report, causing injury to its general and business reputation. The Illinois Supreme Court applied the discovery rule to toll the statute of limitations, finding that the plaintiff acted diligently, despite the fact that, as the court noted, the plaintiff should have known of the risk of injury from a false credit report, because of "increasing awareness of the importance and sensitivity *526 of credit reporting from the standpoint of the persons investigated." (Id. at p. 137, 334 N.E.2d 160) Furthermore, the plaintiff could fairly easily have obtained the false and injurious credit report. As the court pointed out, the Fair Credit Reporting Act (15 U.S.C. § 1681 et seq.) gives consumers the right to obtain (and also to correct and explain) adverse information appearing in a confidential credit report. (Ibid.) Unlike the plaintiff in Tom Olesker's Exciting World of Fashion, appellants possessed neither a reason to suspect they may have been injuriously defamed by Goldman nor the ability to compel Goldman to disclose whether he had defamed them. The plaintiff in Tom Olesker's Exciting World of Fashion may be said to have ignored a risk he should have appreciated and slept on his rights, but that cannot be said of appellants.
Because of the inherently undiscoverable nature of the Goldman oral history, appellants did not know, and with reasonable diligence could not have discovered, the allegedly defamatory statements set forth therein. The trial court's determination that the rule of discovery does not apply in this action was therefore error.
Accordingly, the judgment is reversed and the cause remanded for further proceedings consistent with our holding. Costs on appeal are awarded to appellants.
We concur: LAMBDEN, J.
HAERLE, J.
I respectfully dissent. I believe the holding and language of Shively v. Bozanich (2003) 31 Cal.4th 1230, 7 Cal.Rptr.3d 576, 80 P.3d 676 (Shively) suggest that the unique facts of this case place it within the single publication rule and, separate and apart from that, also beyond the reach of the delayed-discovery rule.[8]
Regarding the single publication rule first of all: as the majority points out, the Shively court specifically reserved judgment regarding cases where there has clearly been a "publication" of the allegedly defamatory material, but where that material has had very limited distribution. In a footnote remarkably applicable to the case before us, the court wrote: "The applicability of the single-publication rule to written publications that receive an extremely limited distribution is not an issue in the present case." (Shively, supra, 31 Cal.4th at p. 1245, fn. 6, 7 Cal.Rptr.3d 576, 80 P.3d 676.) Well, it certainly is in this case, but I will not argue this issue extensively. I simply believe that a publication such as this which is (1) printed by an institution such as the University of California, (2) delivered by it to at least three prominent American libraries, and (3) available at its Bancroft Library to any member of the public who requests access to it, is more like the garden variety books,[9] magazines and newspapers which *527 are clearly, per Shively, subject to the single publication rule than it is to a purely private communication.
I think the applicable law and the record before us are even stronger as to the non-applicability of the discovery rule. In general, "a cause of action for defamation accrues at the time the defamatory statement is `published' (using the term `published' in its technical sense)." (Shively, supra, 31 Cal.4th at p. 1247, 7 Cal.Rptr.3d 576, 80 P.3d 676.) "[P]ublication generally is said to occur on the `first general distribution of the publication to the public.' (Belli v. Roberts [Brothers] Furs (1966) 240 Cal.App.2d 284, 289, [49 Cal.Rptr. 625]; see also Bradford v. American Media Operations [(E.D.Pa.1995)] 882 F.Supp. 1508,] 1514 [collecting cases].) Accrual at that point is believed to provide adequate protection to potential plaintiffs, especially in view of the qualification that repetition of the defamatory statement in a new edition of a book or newspaper constitutes a new publication of the defamation that may give rise to a new cause of action, with a new accrual date. (See Rinaldi v. Viking Penguin, Inc. [(1981)] 52 N.Y.2d [422,] 433, [438 N.Y.S.2d 496, 420 N.E.2d 377].) Under this rule, the cause of action accrues and the period of limitations commences, regardless of when the plaintiff secured a copy or became aware of the publication. (See Strick v. Superior Court (1983) 143 Cal.App.3d 916, 923, [192 Cal.Rptr. 314]; McGuiness v. Motor Trend Magazine (1982) 129 Cal.App.3d 59, 62-63, [180 Cal.Rptr. 784]; Belli v. Roberts Brothers Furs, supra, 240 Cal.App.2d at p. 289, [49 Cal.Rptr. 625]; see also Morgan v. Hustler Magazine (N.D.Ohio 1987) 653 F.Supp. 711, 717; Flynn v. Associated Press (1988) 401 Mass. 776 [519 N.E.2d 1304, 1307-1308].)" (Shively, supra, 31 Cal.4th at pp. 1245-1246, 7 Cal.Rptr.3d 576, 80 P.3d 676, emphasis in original, fn. omitted.)
Courts have applied the discovery rule to defamation cases, but only in the limited cases of defamatory material contained in confidential reports or files. (See, e.g., Manguso v. Oceanside Unified School Dist. (1979) 88 Cal.App.3d 725, 730-731, 152 Cal.Rptr. 27 (Manguso) [school principal placed libelous material in teacher's personnel file]; Staheli v. Smith (Miss.1989) 548 So.2d 1299, 1303, and cases cited therein ["inherently undiscoverable" libel contained in a written recommendation against tenure]; Kittinger v. Boeing Co. (1978) 21 Wash.App. 484 [585 P.2d 812] [libel contained in confidential business memoranda]; Armstrong v. Morgan (Tex.Civ.App.1976) 545 S.W.2d 45 [false report by physician regarding plaintiff's medical condition]; Tom Olesker's Exciting World of Fashion, Inc. v. Dun & Bradstreet, Inc. (1975) 61 Ill.2d 129 [334 N.E.2d 160, 164] [defamatory credit report]; Flynn v. Associated Press, supra, 519 N.E.2d at p. 1307 [suggesting that discovery rule only applies to "inherently unknowable" defamatory publications].)
By contrast, courts have declined to apply the discovery rule in circumstances *528 where the defamatory statement is published in the mass media or receives publicity or is otherwise not a secret or concealed communication. (See, e.g., Shively, supra, 31 Cal.4th at pp. 1249-1251, 7 Cal.Rptr.3d 576, 80 P.3d 676 and cases cited therein; Flotech, Inc. v. E.I. DuPont de Nemours Co. (D.Mass.1985) 627 F.Supp. 358 [defamatory press release was not "inherently unknowable"].) This distinction has been explained thusly: "[C]ases involving claimed defamations by credit reporting agencies can be readily distinguished from those involving alleged defamations through so-called mass-media publication. In claimed libels involving, for example, magazines, books, newspapers, and radio and television programs, the publication has been for public attention and knowledge and the person commented on, if only in his role as a member of the public, has had access to such published information." (Tom Olesker's Exciting World of Fashion, Inc. v. Dun & Bradstreet, Inc., supra, 334 N.E.2d at p. 164; see also McGuiness v. Motor Trend Magazine, supra, 129 Cal.App.3d at p. 63, 180 Cal.Rptr. 784.)
Where I mainly depart from the majority is that, unlike my colleagues, I believe the Shively court suggested rather strongly that writings of the unique sort involved here are more akin to books, magazines and newspapers than they are to confidential communications such as credit and personnel reports and similar confidential memoranda. For example, Shively explained that the delayed accrual of the discovery rule is applied in professional malpractice cases "on the basis that the expertise expected of professionals is beyond the ability of laypersons to evaluate, and on the further basis that it may be impossible for a layperson even to observe the professional's application of this expertise." (Shively, supra, 31 Cal.4th at p. 1248, 7 Cal.Rptr.3d 576, 80 P.3d 676.) In other contexts, the discovery rule is most frequently applied "when it is particularly difficult for the plaintiff to observe or understand the breach of duty, or when the injury itself (or its cause) is hidden or beyond what the ordinary person could be expected to understand." (Ibid.)
At several points during its discussion of the discovery rule, the Shively court stressed the extremely narrow nature of the writings to which that rule applies. Thus, it quoted approvingly from cases holding that the discovery rule applies mainly "`in situations where the defamatory material is published in a manner likely to be concealed from the plaintiff, such as credit reports or confidential memoranda'" or "`in those very limited situations where the allegedly libelous statement occurred in private or confidential publications [that are] not readily available to the plaintiff or the public.'" (Shively, supra, 31 Cal.4th at pp. 1252-1253, 7 Cal.Rptr.3d 576, 80 P.3d 676, quoting, respectively, Schweihs v. Burdick (7th Cir.1996) 96 F.3d 917, 921, and Staheli v. Smith (Miss.1989) 548 So.2d 1299, 1303.)[10]
The majority opinion effectively concedes this standard when it describes (maj. opn. at p. 523) cases subject to neither the single publication or discovery rules as those involving documents as to which there was sufficient "`"`notice or information of circumstances to put a reasonable person on inquiry. ...'"' (Jolly v. Eli Lilly & Co. (1988) 44 Cal.3d 1103, 1110-1111, 245 Cal.Rptr. 658, 751 P.2d 923, *529 quoting Gutierrez v. Mofid (1985) 39 Cal.3d 892, 896-897, 218 Cal.Rptr. 313, 705 P.2d 886, quoting Sanchez v. South Hoover Hospital (1976) 18 Cal.3d 93, 101, 132 Cal.Rptr. 657, 553 P.2d 1129, italics added by the Gutierrez court.) The fact (noted by the majority) that the Goldman transcript was one of 15 oral histories comprising the "Jewish Community Federation Leadership Oral History Project arranged between the Bancroft Library and the Jewish Community Federation (with funding by the latter) suggests rather strongly that it was part and parcel of what had to be an extensive and thus well-known project involving the collection and publication of information about prominent people and events within the San Francisco Jewish community. A "reasonable person" within that community should, therefore, have been "on inquiry" regarding it.
Finally on this issue, I submit that the Shively court drew the line between those publications to which the discovery rule applies and those to which it does not when it stated: "We can see no justification for applying the discovery rule to delay the accrual of plaintiff's causes of action beyond the point at which their factual basis became accessible to plaintiff to the same degree as it was accessible to every other member of the public." (Shively, supra, 31 Cal.4th at p. 1253, 7 Cal.Rptr.3d 576, 80 P.3d 676, emphasis supplied.) In the present case, notwithstanding the admittedly limited distribution of the Goldman interview transcript, it was just as accessible to these appellants as it was to every other member of the general public. Although clearly more limited in distribution than a newspaper, magazine, or book published in the mass media, the transcript was clearly not concealed, confidential, or otherwise "inherently unknowable" or "inherently undiscoverable."
In short, I think the correct interpretation of Shively is that the Goldman transcript is within the single publication rule and, even if not, is not the sort of document to which the discovery rule applies.
NOTES
[1] All statutory references are to the Code of Civil Procedure unless otherwise indicated. Subsequent to the filing of this action, section 340, subdivision (3) was renumbered section 340, subdivision (c), without substantive change.
[2] The demurrer to the second cause of action, alleging "false light," was sustained without leave to amend.
[3] SLAPP is an acronym for strategic lawsuit against public participation. (Briggs v. Eden Council for Hope & Opportunity (1999) 19 Cal.4th 1106, 1109, fn. 1, 81 Cal.Rptr.2d 471, 969 P.2d 564.)
[4] Curiously, Shively discusses magazines only in the portion of the opinion describing the discovery rule. In any case, as codified, the single-publication rule clearly applies to magazines as well as books and newspapers. (Civ.Code, § 3425.3)
[5] The Charles E. Young Research Library, which houses the UCLA Library's central collection of rare books and manuscripts, "primarily serves the research needs of faculty and graduate students from the humanities and social sciences, the School of Public Policy, and the Graduate School of Education & Information Services." The record does not show that materials held by this library are generally available to the public.
[6] Respondents' claim that appellants were or should be deemed to have been on notice of Goldman's oral history and the need to make further inquiry is based on the assertion that the document "received specific notoriety" in an article published in the Jewish Bulletin in 1996, two years after the statute of limitations expired. The claim is wholly untenable. The lengthy article, on the subject of a dinner honoring thousands of donors "who have given any amount to the federation for 25 consecutive years or more," mentions Goldman only in the following sentence, which appeared at the end of the article: "Applause also greeted Alan Rothenberg, current federation president, who presented Richard Goldman, a past president, with an oral history of Goldman's tenure as local leader and philanthropist." This sentence does not attribute "notoriety" to the Goldman oral history or provide reason appellants should have made further inquiry.
[7] Although not germane to the narrow issue we decide, it deserves to be noted that the fact that Goldman's alleged defamations may not yet have injured appellants does not necessarily mean they will not be injured. As applied to magazines and newspapers, the single-publication rule has been justified by some on the ground "that such publications are of passing interest and unlikely to cause substantial harm after their initial impact on the reading public." (2 Harper et al., The Law of Torts (2d ed.1986) § 5.16, at p. 128.) This cannot be said of the Goldman oral history. The transcript of Goldman's statements was not written by a harried reporter under deadline pressure for quick distribution in a daily tabloid. It was prepared and edited by a trained professional over a period of several months pursuant to a detailed protocol(see Baum, Oral History for the Local Historical Society, supra, at p. 57) for preservation in archives maintained at an institution of higher learning for "future historical research." The transcript thus enjoys an aura of authenticity and accuracy denied most of the mass media. Goldman's statements about appellants may in the future be reproduced in an enduring and widely distributed history whose many readers will accept Goldman's statements as accurate even if, as is not now the case, they can be shown to be false and defamatory. However, by that time Rabbi Lipner may no longer have a remedy. As the director of ROHO has noted, the likelihood that an oral history may be found libelous is significantly diminished by the fact that "the dead cannot be libeled." (Id. at p. 52)
[8] The Shively court made clear that there is no overlap between these two rules when it said: "Inquiry into whether delay in discovering the publication was reasonable has not been permitted for publications governed by the single-publication rule." (Shively, supra, 31 Cal.4th at p. 1251, 7 Cal.Rptr.3d 576, 80 P.3d 676.)

However, as the majority recognizes (maj. opn. at p. 523), a document not within the single publication rule is not necessarily subject to the discovery rule. One such instance is where the document is a "multiple publication." (Cf. Traditional Cat Assn., Inc. v. Gilbreath (2004) 118 Cal.App.4th 392, 403-404, 13 Cal.Rptr.3d 353.) Additionally, and to quote the majority, there are "situations in which the discovery rule should not be applied to a non-mass media communication as where the libel" was published in such a manner as to put a reasonable person on inquiry. (Maj. opn. at p. 523.)
[9] Even the issue of published and distributed books is now far more complex than the majority seems to envision. A recent article in the New York Times notes that, in addition to the well-known "vanity press" by which ambitious (or ego-driven, or both) authors have long been able to publish a book for very limited distribution, the same is now available "online" by a new, and fast-growing, business known as "self-publishing." The article identifies three online businesses "aimed primarily at writers who can't get the attention of traditional publishers" in addition to the traditional refuge of such writers, the "vanity press." (Glazer, How to be Your Own Publisher, N.Y. Times Book Review (Apr. 24, 2004) p. 10.) Although I am admittedly curious as to how the majority would classify such publications, I suggest that, its footnote 6 notwithstanding, the Shively court would classify them as governed by the single publication rule  or at least (see ante) as not subject to the discovery rule.
[10] An Arizona appellate court has made the same point in these words: "We believe the rule of discovery should be applied in those situations in which the defamation is published in a manner in which it is peculiarly likely to be concealed from the plaintiff, such as a confidential memorandum or a credit report." (Clark v. Airesearch Manufacturing Company (Ariz.App.1983) 138 Ariz. 240, 673 P.2d 984, 986, emphasis supplied.)