Filed 9/29/23 Certified for Publication 10/20/23 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| CRAIG ROSS et al., | B312337 |
| Plaintiffs and Appellants, | (Los Angeles County Super. Ct. No. 20SMCV00587) |
| v. | |
| SEYFARTH SHAW LLP et al., | |
| Defendants and Appellants. | |

APPEAL from an order and judgment of the Superior Court of Los Angeles County, Harry Jay Ford, III, Judge. Affirmed in part and reversed in part.

Craig Ross and Natalie Operstein, in pro. per., for Plaintiffs and Appellants.

Jassy Vick Carolan, Jean-Paul Jassy and Jeffrey A. Payne for Defendants and Appellants.

_____

This is an appeal from an order granting defendants Seyfarth Shaw LLP (Seyfarth) and Colleen Regan a portion of the fees they requested pursuant to Code of Civil Procedure section 425.16[1] (the anti-SLAPP[2] statute) and resulting judgment. The trial court awarded the fees without finally ruling on defendants' anti-SLAPP motion to strike—it issued a tentative ruling granting in part and denying in part the motion, and plaintiffs immediately thereafter dismissed their complaint. Plaintiffs Craig Ross and Natalie Operstein appeal the fee award on three general theories. First, the anti-SLAPP statute did not apply to their claims, and, in any event, their claims were meritorious. Second, the fees should not have been awarded because defendants did not meet the fee award requirements of subdivision (c)(1) or because judicially created exceptions to their right to seek a fee award applied. Third, even if fees were awardable, the amount awarded was unreasonable.

Defendants cross-appeal. They argue the trial court should have awarded all the fees they requested, not just a portion of those fees, because all of plaintiffs' claims were based on conduct protected by the anti-SLAPP statute, no exceptions applied, and their request was reasonable.

We agree with defendants that their motion to strike was wholly meritorious and their fee request therefore should not have been reduced on the grounds that they would have prevailed only partially on their motion. We disagree with plaintiffs that the trial

---

[1] Undesignated statutory references are to the Code of Civil Procedure. Undesignated references to statutory subdivisions are to section 425.16.

[2] This acronym stands for " 'strategic lawsuit against public participation.' " (*Wilson v. Cable News Network, Inc.* (2019) 7 Cal.5th 871, 882, fn. 2 (*Wilson*).)

court erred in the ways they claim. We therefore affirm in part and reverse in part and remand for further proceedings consistent with this opinion.

## BACKGROUND

Plaintiff Operstein was employed as a professor of linguistics at California State University, Fullerton (CSUF), which is part of the California State University (CSU) system. Plaintiff Ross is her husband.

In the course of Operstein's employment, she experienced conflict with her colleagues in the linguistics department. This prompted Operstein to make various written complaints. In early 2013, she wrote to the chair of the department about perceived mistreatment by a peer. By May 2014, the matter had escalated to human resources. In an e-mail to CSUF's Director of Faculty & Staff Labor Relations James Busalacchi, Operstein outlined perceived "widened and intensified" harassment, including "retaliatory employment actions, defamation, violations of contract and university policies, falsification of records, interference with performance, groundless opposition to a[] . . . request for promotion, and possible discrimination." In seeking to bypass a suggested grievance process, Operstein urged that "[t]he sophisticated matters of law and the extent of the injury involved will require professional legal expertise and experience" and offered that "an investigation by [human resources] may be the most efficient way to proceed." CSUF obliged.

In November 2014, CSUF engaged Seyfarth, a law firm, to investigate Operstein's accusations against three of her colleagues. Its letter engaging Seyfarth identified a nonexclusive list of authorities authorizing the investigation, including CSU Executive Order 1096, entitled "Systemwide Policy Prohibiting Discrimination, Harassment and Retaliation Against Employees

3

and Third Parties and Procedure for Handling Discrimination, Harassment and Retaliation Allegations by Employees and Third Parties."

Colleen Regan, at the time a partner at Seyfarth, had primary responsibility for the investigation. Over the course of about a month, Regan interviewed Operstein's three colleagues she accused of misconduct and another individual. She also attempted to interview Operstein, but Operstein agreed only to respond to written questions. Regan submitted three written questions to Operstein; Operstein responded in writing with an answer to just one. The unanswered questions were requests for evidence and witnesses known to Operstein but not yet disclosed to Regan.

Regan provided a summary of her investigation and findings in an eight-page report dated December 18, 2014 addressed to Mr. Busalacchi and another CSUF employee. The report concluded that none of Operstein's allegations was well founded. As relevant to Operstein's allegations that colleagues defamed her when they called her "uncollegial," Regan wrote: "I conclude by reading the email traffic that much of Dr. Operstein's conduct and email communication was the opposite of collegial. She regularly accused her coworkers of violations and infractions of policy, and of defaming her and violating her rights, all with no apparent basis." Regan also wrote: "Every witness interviewed stated that Dr. Operstein is well-regarded as a scholar and researcher, and appears to be a fine teacher. However, since the beginning of her employment at CSUF, she has been difficult for virtually everyone to work with. At least one administrative support employee has requested never to work with her again, and many others find her behavior odd, and even threatening."

Operstein's relationship with CSUF further soured shortly after Seyfarth completed its report. In March 2015, Operstein filed

a discrimination charge with the Equal Employment Opportunity Commission (EEOC) against CSUF. Operstein identified 22 entities, individuals, or classes thereof, as respondents in her May 2015 EEOC charge, including CSU, certain of its agents and employees, and defendant Regan. In early May 2015, CSUF recommended termination of Operstein's employment purportedly due to lack of progress towards tenure. Later that month, Operstein filed another charge of discrimination with the EEOC.

In March 2016, plaintiffs filed a lawsuit in state court against CSU's board of trustees. Their complaint contained 20 causes of action relating to Operstein's employment and the termination of her employment.

In June 2017, plaintiffs filed another lawsuit, this one in federal court. Their second amended complaint in that action named more than 50 individual defendants, including various high ranking state officials, CSU officials, and, among others, Regan. Plaintiffs alleged Regan "conspir[ed] with state officials to discriminate against plaintiff Operstein and to deprive plaintiffs of lifetime employment contract [*sic*] and related benefits and of liberty resulting from said deprivation." In June 2018, the federal court dismissed all of Ross's claims with prejudice. In July 2019, it entered summary judgment against Operstein on all her claims.

In April 2020, plaintiffs filed the lawsuit underlying this appeal. In a complaint solely against Seyfarth and Regan, plaintiffs asserted 11 causes of action based on defendants' work for CSUF in connection with Operstein's internal complaints of workplace harassment and related mistreatment.

The factual allegations include the following:

"Defendants entered into contract with CSU to investigate [Operstein's] [c]omplaints."

The scope of defendants' work was "limited to investigation of

[Operstein's] [c]omplaints and did not include investigation of Dr. Operstein or her conduct." (Underscoring omitted.)

Defendants' contract with CSU was governed by a "CSU Executive Order governing investigations of discrimination and harassment complaints" and required them to act as an "impartial tribunal." (Underscoring omitted.)

Defendants "assumed said role of an impartial tribunal with the ulterior intent to make findings in favor of [CSUF] and its officials" in order to enhance future business prospects. (Underscoring omitted.)

In conducting their investigation, defendants: "(1) selectively reviewed evidence in favor of employer and/or employer's officials; (2) disregarded and refrained from obtaining and probing evidence which supported [Operstein's] [c]omplaints; (3) limited their interviews to the reported wrongdoers, their subordinates, and employees who relied on the reported wrongdoers for their promotions; (4) disregarded and refrained from obtaining and probing evidence of violation [*sic*] of Dr. Operstein's constitutional, contractual, and/or legal rights by CSU and/or its officials, agents, and/or employees; (5) disregarded and refrained from obtaining and probing evidence of potentially retaliatory adverse employment actions." (Underscoring omitted.) We refer to these allegations as the "paragraph 31 allegations" because they were made in paragraph 31 of plaintiffs' complaint.

In sum, the complaint alleges that, with improper motive, defendants (1) conducted a biased and otherwise flawed investigation of Operstein's complaints; and (2) prepared and submitted a report that was defamatory of Operstein.

Defendants responded with a motion to strike plaintiffs'

6

complaint under the anti-SLAPP statute.[3]  They supported their motion with declarations and extensive documentary evidence, including documents they reviewed in the course of their investigation and the resulting report.  Plaintiffs opposed the motion and submitted declarations and evidence of their own totaling nearly 3,000 pages.  Defendants filed a reply and plaintiffs filed a 70-page surreply.

On the same day plaintiffs filed their surreply, the trial court issued a tentative ruling on defendants' special motion to strike. The court was inclined to strike three of the 11 causes of action ("negligent misrepresentation and constructive fraud," "defamation," and "fraud and deceit") because the allegations supporting those causes of action "arise solely from protected activity under . . . subdivisions (e)(1) and (e)(2)," but was inclined to request further briefing as to whether defendants' alleged investigative conduct was protected under the anti-SLAPP statute. The allegations the trial court viewed as potentially unprotected were the paragraph 31 allegations as well as an allegation in paragraph 38 of plaintiffs' complaint that defendants "harass[ed] Dr. Operstein with a close to midnight taped deposition."

Later, on the same day the trial court issued its tentative ruling, plaintiffs voluntarily requested dismissal of their entire lawsuit.  The court granted their request.

Shortly thereafter, defendants filed their motion for attorney fees and costs pursuant to subdivision (c).  Their ultimate total request was $79,889.  The trial court granted this only in part, finding defendants would have only partially prevailed on their special motion to strike.  It adopted its tentative ruling that three of

[3]  Defendants also offered other grounds to strike the complaint not relevant to this appeal from the trial court's fee award.

the causes of action arose entirely from protected activity. It found that the other eight causes of action relied in part on investigative activity that was noncommunicative (the paragraph 31 allegations and "close to midnight taped deposition" allegation), which the trial court deemed unprotected. It found the causes of action based on protected activity unmeritorious because they were privileged under Civil Code section 47, subdivision (b) and, in any event, time-barred by the applicable statute of limitations. Accordingly, the trial court concluded it would have struck the three causes of action supported exclusively by protected activity and all allegations of protected activity supporting the other eight causes of action. The court awarded defendants $63,911—80 percent of the fees they requested.

Plaintiffs appealed and defendants cross-appealed.

## DISCUSSION

### 1.      Overview of the Anti-SLAPP Statute

The anti-SLAPP statute provides a procedure for courts "to dismiss at an early stage nonmeritorious litigation meant to chill the valid exercise of the constitutional rights of freedom of speech and petition in connection with a public issue." (*Sipple v. Foundation for Nat. Progress* (1999) 71 Cal.App.4th 226, 235.) It broadly applies to causes of action "arising from" specified protected activity: "any act of [a] person in furtherance of the person's right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue . . . ." (§ 425.16, subd. (b)(1).)

Courts must "broadly" construe the anti-SLAPP statute to further the legislative goals of encouraging participation in matters of public significance and discouraging abuse of the judicial process. (§ 425.16, subd. (a).)

To prevail on a special motion to strike a SLAPP suit, the

defendant must "make an initial prima facie showing that plaintiff's suit arises from an act in furtherance of defendant's right of petition or free speech." (*Braun v. Chronicle Publishing Co.* (1997) 52 Cal.App.4th 1036, 1042–1043.) If this burden is met, the plaintiff must establish a reasonable probability he or she will prevail on the merits. (*Wilcox v. Superior Court* (1994) 27 Cal.App.4th 809, 824–825, disapproved on another ground in *Equilon Enterprises v. Consumer Cause, Inc.* (2002) 29 Cal.4th 53, 68, fn. 5.) In determining whether each party has met its burden, the trial court must "consider the pleadings, and supporting and opposing affidavits . . . ." (§ 425.16, subd. (b)(2).)

A "prevailing defendant" on a special motion to strike is "entitled to recover that defendant's attorney's fees and costs." (§ 425.16, subd. (c)(1).) The purpose of this provision is to provide the SLAPP defendant financial relief from the plaintiff's meritless lawsuit. (*Liu v. Moore* (1999) 69 Cal.App.4th 745, 750 (*Liu*).) The trial court's fee award pursuant to this authority is the subject of this appeal.

## 2.    **Prevailing Defendant Standards**

Not every defendant who obtains some relief on a special motion to strike is a "prevailing defendant" for purposes of recovering fees and costs under the anti-SLAPP statute. A defendant who is only partially successful will generally be considered to have prevailed, but not if "the results of the motion were so insignificant that [he or she] did not achieve any practical benefit from bringing the motion." (*Mann v. Quality Old Time Service, Inc.* (2006) 139 Cal.App.4th 328, 340.) Whether a partially successful defendant achieved sufficient benefit to be a "prevailing party" is left to the discretion of the trial court and reviewed accordingly. (*Ibid.*)

When a plaintiff dismisses his or her complaint while the

9

defendant's special motion to strike is pending, courts agree they retain jurisdiction to award fees and costs. (See, e.g., *Coltrain v. Shewalter* (1998) 66 Cal.App.4th 94, 107 (*Coltrain*); *Liu, supra,* 69 Cal.App.4th at p. 752; *Tourgeman v. Nelson & Kennard* (2014) 222 Cal.App.4th 1447, 1456 (*Tourgeman*).) This is because permitting an eleventh-hour dismissal to eliminate financial liability would undermine the deterrent purpose of the anti-SLAPP statute. (See *Liu,* at pp. 750–751.)

Plaintiffs argue that fee and cost awards are not mandatory where a plaintiff has dismissed the special motion to strike before it was heard. Plaintiffs are correct. (*Liu, supra,* 69 Cal.App.4th at p. 753.) Preadjudication dismissals do not automatically render the defendant the "prevailing party" for purposes of subdivision (c)(1). But upon a determination that the defendant *is* the prevailing party, the fee award becomes mandatory (subject to limitations on an award in the context of a fully adjudicated motion). (§ 425.16, subd. (c)(1).)

The court in *Coltrain* held the award of fees is discretionary, dependent upon whether the movant "realized its objectives in the litigation." (*Coltrain, supra,* 66 Cal.App.4th at p. 107.) "Since the defendant's goal is to make the plaintiff go away with its tail between its legs, ordinarily the prevailing party will be the defendant." (*Ibid.*) The fact of the dismissal gives rise to a presumption that the defendants prevailed. (*Ibid.*) However, the plaintiff may show "it actually dismissed because it had substantially achieved its goals through a settlement or other means, because the defendant was insolvent, or for other reasons unrelated to the probability of success on the merits." (*Ibid.*) The *Coltrain* approach does not require an analysis of the merits of the motion to strike under the anti-SLAPP statute.

The court in *Liu, supra,* disagreed with the *Coltrain*

10

approach. (*Liu, supra*, 69 Cal.App.4th at p. 752.) In the *Liu* court's view, a determination of whether a defendant would have prevailed on its special motion to strike using the ordinary anti-SLAPP statute analysis is an essential predicate to an award of fees and costs under subdivision (c)(1). (*Liu,* at p. 752.) Under the *Liu* approach, a trial court must consider the merits of the filed special motion to strike and ascertain whether the defendant is a "prevailing defendant" on that basis, just as it would have if the complaint had not been dismissed. (See, e.g., *Tourgeman*, *supra*, 222 Cal.App.4th at p. 1458.)

Under either the *Coltrain* standard or the *Liu* standard, defendants entirely prevailed in their special motion to strike.

3. **Under *Coltrain*, Defendants Prevailed Because Plaintiffs Dismissed Their Suit and Fail to Show It Was for Reasons Unrelated to Lack of Merit**

As set forth in *Coltrain*, a plaintiff's dismissal gives rise to the presumption that the defendant prevailed. (*Coltrain*, *supra*, 66 Cal.App.4th at p. 107.) A plaintiff may, as plaintiffs do here, attempt to rebut this presumption by offering a "reason[] unrelated to the[ir] probability of success on the merits." (*Ibid*.) The reason plaintiffs offer is that they discovered CSU may have been indemnifying defendants in this action. Specifically, they assert they "dismissed the case before hearing on the anti-SLAPP motion upon their discovering that Seyfarth was indemnified by CSU, sued by [plaintiffs] in the same court for discriminatory and retaliatory termination." They offer no record citation for this assertion in their appellate brief. Nor do they explain why the indemnification would affect their desire to recover damages on account of defendants' alleged misconduct. And, most critically, they fail to assert that the purported discovery of CSU's alleged indemnification was the cause of their decision to withdraw their

11

complaint. The record establishes it was not.

Plaintiffs continued to vigorously pursue their action despite having knowledge of the claimed indemnity well prior to the dismissal. On October 26, 2020, plaintiffs filed an unauthorized 70-page surreply in opposition to defendants' anti-SLAPP motion. The surreply referred to the claimed indemnity by CSU in favor of defendants. This negates any implication plaintiffs decided to dismiss their case because of the indemnity.

**4. Under *Liu*, Defendants Were the Prevailing Party Because Their Anti-SLAPP Motion Was Entirely Meritorious**

The parties agree we should consider de novo whether defendants would have prevailed on their special motion to strike. We review a trial court's disposition of an anti-SLAPP motion de novo. (*Simmons v. Bauer Media Group USA, LLC* (2020) 50 Cal.App.5th 1037, 1043.) It follows that we apply the same standard of review to a trial court's determination of how it would have resolved such a motion. (See, e.g., *Tourgeman, supra,* 222 Cal.App.4th at p. 1458 ["determining whether respondents would have prevailed on their anti-SLAPP motion" was necessary predicate to reviewing prevailing party determination].) We therefore consider the same two-step analysis of defendants' motion that the trial court did.

**a. All of plaintiffs' causes of action depend on protected activity.**

To satisfy the first step in the anti-SLAPP analysis, defendants need only show the alleged conduct underlying plaintiffs' claims is protected under the anti-SLAPP statute. (*Navellier v. Sletten* (2002) 29 Cal.4th 82, 88.) "[A] claim is subject to an anti-SLAPP motion to strike if its elements arise from protected activity." (*Bonni v. St. Joseph Health System* (2021) 11

12

Cal.5th 995, 1015 (*Bonni*).) But if a cause of action would survive without the challenged allegations, it must not be stricken. (*Id.* at p. 1012 ["to the extent any acts are unprotected, the claims based on those acts will survive"].)

Defendants argue that all of plaintiffs' causes of action rely exclusively on allegations of conduct protected under subdivision (e)(1), (2), or (4). Plaintiffs disagree for three reasons. First, they contend defendants' investigation is subject to the commercial exception to the anti-SLAPP statute set forth in section 425.17. Second, they contend the investigation is subject to the illegality exception described in *Flatley v. Mauro* (2006) 39 Cal.4th 299 (*Flatley*). Third, they contend defendants' investigation is not an "official proceeding authorized by law" within the meaning of subdivision (e)(1) and (2). They further contend that allegations concerning the content of defendants' report, even if protected, are unnecessary to their causes of action. They argue the trial court correctly found defendants' motion would have been denied as to the eight causes of action that rely on the paragraph 31 allegations, and that two causes of action the trial court said would have been stricken also relied on those same allegations, so the trial court was wrong as to these.

We agree with defendants that all conduct by defendants alleged in the complaint is protected under the anti-SLAPP statute.

### i. Defendants' investigation was an official proceeding authorized by law.

The Court of Appeal in *Laker v. Board of Trustees of California State University* (2019) 32 Cal.App.5th 745 (*Laker*) held that investigations by CSU into employee allegations of workplace misconduct pursuant to CSU executive orders were " 'official proceedings authorized by law' that receive the protections of the anti-SLAPP statute." (*Id*. at p. 765.) It reasoned that the phrase

13

embraces proceedings required by statute, CSU had statutory authority (Ed. Code, § 89030) to make rules governing their employees, and CSU used that authority to mandate comprehensive responses to employee complaints of workforce misconduct. (*Laker*, at p. 764.) We agree with the trial court that *Laker* is directly applicable here and renders CSU's investigation an " 'official proceeding[] authorized by law.' " (*Ibid*.)

Plaintiffs attempt to distinguish *Laker* on various grounds. They first argue defendants' investigation was not authorized by Executive Order 1096, referenced in the Seyfarth engagement letter, because the order "states on its face that complaints filed on or before [June 3,] 2014 cannot be investigated [thereunder]" (italics omitted) and Operstein filed her complaint on May 16, 2014, two weeks before the cutoff date. Plaintiffs fail to acknowledge in their opening brief that an executive order bearing the same title as Executive Order 1096—Executive Order 1089—was in effect immediately prior to the enactment of Executive Order 1096 and similarly governed investigations of employee complaints of workplace misconduct. Operstein's declaration in opposition to the special motion to strike admits CSUF told her in May 2014 Executive Order 1089 would govern. Like Executive Order 1096, Executive Order 1089 required CSUF, directly or through an appointed investigator, to investigate employee complaints and prepare a written report regarding the findings. Plaintiffs themselves allege the investigation was governed by an executive order which mandated "a diligent, fair, and impartial investigation." That such a mandate arose by executive order is all that matters under the *Laker* analysis. The number of the executive order does not.

In their reply brief, plaintiffs make a series of new arguments that the investigation was not a proceeding authorized by law.

14

These include that the investigation violated Operstein's due process rights and was a sham and various attacks on the executive orders and defendants' use of them. Plaintiffs offer no explanation for why they held these arguments until their reply brief. We therefore ignore them. (See, e.g., *Murray & Murray v. Raissi Real Estate Development, LLC* (2015) 233 Cal.App.4th 379, 388–389 [deeming waived arguments "raised for the first time on reply and [which appellant] made no attempt to show good cause why [they] should [be] consider[ed]"].)

### ii. Defendants' communicative conduct is protected under subdivision (e)(1) and (2).

The court in *Laker* found subdivision (e)(1) and (2) applied to statements by a witness in an internal CSU investigation. (*Laker, supra*, 32 Cal.App.5th at p. 766.) Regan's statements at issue here were similarly made in the course of an internal CSU investigation. Regan as a partner of Seyfarth was the CSU-appointed investigator. As plaintiffs allege, defendants' role was to act impartially in investigating and reporting on the results of their investigation into Operstein's allegations.

The trial court found defendants' communicative conduct alleged in the complaint constituted written or oral statements or writings made before and in connection with an issue under consideration or review in an official proceeding authorized by law, bringing them within the ambit of subdivision (e)(1) and (2). We agree.

Aside from incorrectly claiming Seyfarth's investigation was not an official proceeding authorized by law, plaintiffs fail in their opening brief to argue subdivision (e)(1) and (2) do not apply to defendants' alleged communicative conduct. This failure forfeits any other challenge to the issue.

15

### iii.     Defendants' noncommunicative conduct is protected under subdivision (e)(4).

In assessing the status of plaintiffs' noncommunicative conduct alleged in the complaint, defendants urge us to take the approach of the court in *Vergos v. McNeal* (2007) 146 Cal.App.4th 1387 (*Vergos*), which treated all investigative conduct as communicative. The *Vergos* court reached its conclusion on the basis that denial of the grievance was the "gravamen" of the complaint and the noncommunicative conduct was part and parcel of the communication of the adverse results. (*Id.* at p. 1397.) Since the *Vergos* decision issued, our Supreme Court has mandated a more granular evaluation of the allegations underlying a cause of action and its subsidiary claims, and disapproved of the gravamen analysis that appears to have been employed in *Vergos*, so we will not rely on *Vergos*. (See *Bonni*, *supra*, 11 Cal.5th at p. 1012 [where "various acts [serve] as a basis for relief . . . , each act or set of acts must be analyzed separately under the usual two-step anti-SLAPP framework"].)

Nevertheless, we find defendants' conduct of the investigation is embraced within subdivision (e)(4), which protects "conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest." (*Ibid.*; *Bonni*, *supra*, 11 Cal.5th at p. 1012.) Though such "conduct" may be communicative, it need not be in order to be protected activity. (See *Peregrine Funding, Inc. v. Sheppard Mullin Richter & Hampton LLP* (2005) 133 Cal.App.4th 658, 672 [noncommunicative litigation tactics such as withholding documents are protected activity].)

The parties agree that to qualify for protection under subdivision (e)(4), a public issue or public interest must be

16

implicated.  Defendants argue Operstein's allegations as to her academic renown and the interests of California and the public in the investigatory process supply the requisite issue or interest. Plaintiffs respond that Operstein does not have such prominence that any comment about her is necessarily of public interest and analogize her claims to the "garden-variety employment dispute" deemed unprotected in *Wilson, supra,* 7 Cal.5th at page 901.

We agree with plaintiffs that Operstein's academic profile does not furnish a public issue for purposes of the anti-SLAPP statute.  But we disagree that her claims against defendants are a typical employment dispute.  Defendants were not Operstein's employer.  They did not terminate her.  Plaintiffs are attacking defendants' conduct in an official proceeding authorized by law to address workplace misconduct.  Plaintiffs' sole relationship with defendants is through this proceeding and all conduct they allege is actionable took place within its confines.  As plaintiffs allege, the public has an interest in this process.  We agree with defendants that such interest satisfies the public issue or interest requirement of subdivision (e)(4).

In *FilmOn.com Inc. v. DoubleVerify Inc.* (2019) 7 Cal.5th 133 (*DoubleVerify*), our Supreme Court held that subdivision (e)(4) "encompasses conduct and speech similar to what is referenced in . . . subdivision (e)(1) through (3)" and is meant to "round out the statutory safeguards for constitutionally protected expression" the rest of the subdivision provides.  (*DoubleVerify*, at p. 144.)

As an example, the *DoubleVerify* court favorably cited our decision in *Mendoza v. ADP Screening & Selection Services, Inc.* (2010) 182 Cal.App.4th 1644 (*Mendoza*).  (*DoubleVerify*, *supra*, 7 Cal.5th at p. 145.)  That case considered whether claims against an employee screening company that it had wrongfully accessed and relayed information in a sex offender registry to a job

17

applicant's prospective employer were of "public interest" for purposes of the anti-SLAPP statute.  In answering in the affirmative, we recognized "the public interest in safe workplaces, and in the liability which may attach to employers who fail to investigate prospective employees where prudence justifies such an investigation." (*Mendoza*, at p. 1653.)  We therefore concluded "providing employment-screening reports is a constitutionally founded, protected activity within the meaning of the anti-SLAPP statute." (*Ibid*.)  The Supreme Court quoted this same language in *DoubleVerify*.  (*DoubleVerify*, at p. 145.)

We think *Mendoza*'s conclusion regarding public interest applies to defendants' investigative conduct in this case.  CSUF engaged defendants to investigate Operstein's allegations of workplace misconduct.  CSUF faced the threat of liability for failing to investigate Operstein's complaints.  (See Gov. Code, § 12940, subds. (j), (k).)  On behalf of CSUF, defendants conducted their investigation so they could prepare and submit to CSUF a written report.  Like in *Mendoza*, defendants' conduct, written and noncommunicative, advanced the public interest in providing a safe working environment.  The investigation defendants performed here was required under a statutorily authorized executive order of a large public university system.

Plaintiffs argue subdivision (e)(4) cannot apply under the Supreme Court's decision in *Wilson*.  *Wilson* was issued shortly after *DoubleVerify* and cites *DoubleVerify* extensively.  *Wilson* concerned what categories of *speech* are protected under subdivision (e)(4).  (*Wilson, supra,* 7 Cal.5th 871.)  The *Wilson* court reasoned that "a defendant who claims its speech was protected as 'conduct in furtherance of the exercise of [free speech rights] in connection with a public issue or an issue of public interest' (*id*., subd. (e)(4)) must show not only that its speech referred to an issue

18

of public interest, but also that its speech contributed to public discussion or resolution of the issue." (*Wilson,* at p. 900.)

By its terms, the *Wilson* test applies only to speech, not noncommunicative conduct. But applying the logic that resulted in the *Wilson* test for speech, we would still be satisfied defendants' noncommunicative investigative conduct satisfies the public issue requirement under subdivision (e)(4) because it is so bound up with protected conduct enumerated in subdivision (e)(1) and (2). (See *Bonni, supra,* 11 Cal.5th at p. 1020 [*Wilson* test, as applied to noncommunicative acts, asks whether acts "furthered the [defendants'] speech or petitioning rights because they bore some 'substantial relationship' to the [defendants'] 'ability to [petition or] speak on matters of public concern' "].) In fact, defendants' noncommunicative conduct directly "further[ed]" speech—the report—falling squarely within the coverage of subdivision (e)(1) and (2). (§ 425.16, subd. (e)(4).)

As our Supreme Court has repeatedly observed, the anti-SLAPP statute " ' "*equate*[s] a public issue with the authorized official proceeding to which it connects." ' " (*DoubleVerify*, *supra*, 7 Cal.5th at p. 144, quoting *Briggs v. Eden Council for Hope & Opportunity* (1999) 19 Cal.4th 1106, 1117 (*Briggs*).) By defining them as " 'act[s] in furtherance of a person's right of petition or free speech . . . in connection with a public issue,' " subdivision (e) treats as per se connected to a "public issue" any communicative conduct before, or in connection with an issue under consideration or review by, an official proceeding authorized by law. (§ 425.16, subd. (e)(1), (2); *Briggs*, at p. 1116.) Defendants' written report is therefore communicative activity aimed at the resolution of the inherently public issue underlying the complaint process (in addition to implicating the public issue of workplace safety as already discussed).

Defendants' noncommunicative investigative conduct necessarily furthered the preparation of their report within the meaning of subdivision (e)(4). The investigation was done for the purpose of preparing the report. Executive Orders 1089 and 1096 each command that investigators appointed to review employee complaints, like defendants, must conduct an investigation within a specified period and, within that same period, prepare their "investigative report." The report must summarize the allegations and investigative process, recite the evidentiary standard, describe the evidence considered, contain factual findings, and state whether any violation occurred. As defendants explain, "there can be no report without the antecedent investigation," and the sole purpose of the investigation is to be able to develop and communicate a resolution of the complaint.

### iv. Plaintiffs fail to show any exceptions to the anti-SLAPP statute apply.

The commercial exception, established in section 425.17, subdivision (c), applies only to comparative advertising— " 'representations of fact about [the defendant's] or a business competitor's business operations, goods, or services.' " (*Dziubla v. Piazza* (2020) 59 Cal.App.5th 140, 154, quoting § 425.17, subd. (c)(1).) No such statements are at issue here.

The illegality exception is similarly inapplicable. Our Supreme Court articulated this exception in *Flatley* when it held that "a defendant whose assertedly protected speech or petitioning activity was illegal as a matter of law, and therefore unprotected by constitutional guarantees of free speech and petition, cannot use the anti-SLAPP statute to strike the plaintiff's complaint." (*Flatley*, *supra*, 39 Cal.4th at p. 305.) The rule applies only in "narrow circumstance[s], where either the defendant concedes the illegality of its conduct or the illegality is conclusively shown by the evidence

20

. . . ." (*Id.* at p. 316.) Courts, including ours, have interpreted "illegality" as used in *Flatley* as limited to violations of *criminal* law. (*Mendoza, supra*, 182 Cal.App.4th at p. 1654 ["use of the phrase 'illegal' [in *Flatley*] was intended to mean criminal, and not merely violative of a statute"].) Defendants do not concede any wrongdoing, much less criminal conduct. Plaintiffs have not demonstrated any of their allegations against defendants conclusively show illegality.

Having determined that all of defendants' conduct alleged in the complaint is subject to the protection of subdivision (e), we turn to the second step of the anti-SLAPP analysis.

### b. Plaintiffs cannot demonstrate a probability of success on the merits.

As they did at the trial level, defendants argue multiple reasons plaintiffs cannot meet their step two burden of showing "a probability that [they] will prevail on the[ir] claim[s]." (§ 425.16, subd. (b)(1).) We find all of plaintiffs' causes of action are time-barred. We therefore need not consider whether plaintiffs demonstrated a probability they could overcome the bar of the litigation privilege, Civil Code section 47, subdivision (b), or the doctrine of claim preclusion (the aspect of *res judicata* defendants also invoked).

A plaintiff cannot show a probability of prevailing on the merits of a cause of action for anti-SLAPP purposes where the cause of action is barred by the statute of limitations. (*Traditional Cat Assn., Inc. v. Gilbreath* (2004) 118 Cal.App.4th 392, 399; see also *Garcia v. Rosenberg* (2019) 42 Cal.App.5th 1050, 1059 [merits prong unsatisfied as to time-barred action]; *Yang v. Tenet Healthcare Inc.* (2020) 48 Cal.App.5th 939, 950 [same].)

Defendants provide authority that plaintiffs' 11 causes of action are subject to a range of limitation periods not exceeding four

21

years.  Plaintiffs do not dispute this.  Therefore, we accept as true that all plaintiffs' causes of action are time-barred, unless, as plaintiffs contend, they are tolled under the doctrines of delayed discovery, "equitable tolling," and the California Rules of Court COVID-19 Emergency Rule 9(a).  We address each in turn, finding no basis for tolling the statute of limitations.

### i.      Delayed discovery

"Generally speaking, a cause of action accrues at 'the time when the cause of action is complete with all of its elements.' " (*Fox v. Ethicon Endo-Surgery, Inc.* (2005) 35 Cal.4th 797, 806.)  But the delayed discovery rule "postpones accrual of a cause of action until the plaintiff discovers, or has reason to discover, the cause of action." (*Id.* at p. 807.)  For these purposes, "[a] plaintiff has reason to discover a cause of action when he or she 'has reason at least to suspect a factual basis for its elements.' [Citations.]  . . . [S]uspicion of one or more of the elements of a cause of action, coupled with knowledge of any remaining elements, will generally trigger the statute of limitations period.  [Citations.]  . . .  Rather than examining whether the plaintiffs suspect facts supporting each specific legal element of a particular cause of action, we look to whether the plaintiffs have reason to at least suspect that a type of wrongdoing has injured them." (*Ibid.*)  The party claiming the benefit of the delayed discovery rule bears the burden of showing its applicability.  (*Id.* at p. 808.)

The trial court concluded plaintiffs' causes of action accrued not later than February 9, 2015, when CSU notified Operstein by letter of defendants' conclusions in their report.  The report stated Operstein was not a victim of harassment, retaliation, or defamation and that "much of [Operstein's] conduct was not collegial in that [she] regularly accused [her] coworkers of violations and infractions of policy, and of defaming [her] and violating [her]

rights, all with no apparent basis." It also described the information defendants relied upon in preparing the report: "Regan interviewed four individuals and reviewed related documents, including multiple email communications" but had not received information requested from Operstein. The letter showed the report was sent also to CSUF's Provost and vice president of Academic Affairs; its vice president for Human Resources, Diversity and Inclusion; and the dean of its College of Humanities and Social Sciences. Plaintiffs presumably believed defendants' conclusions were false when Operstein received this letter. These wrongs are at the core of their claims against defendants. The letter, the trial court concluded, sufficed to put plaintiffs on notice of their claims and commence the applicable limitations periods.

According to plaintiffs, when they received defendants' report in February 2015, "they had no knowledge whatsoever as to the *basis and evidence* on which [defendants'] investigation and report were made" and it "was conceivable that [defendants'] statements [in the report] about Operstein were made in good faith on the grounds of falsified documents submitted to [defendants] by CSU." Plaintiffs contend none of their causes of action accrued until April 2019, when they received discovery in the federal litigation they commenced in June 2017. The only connection they draw between the 2019 production and the accrual of their present causes of action is that the 2019 production was relevant to a qualified privilege defense—Civil Code section 47, subdivision (c)— defendants might have asserted against their causes of action. Civil Code section 47, subdivision (c) makes privileged certain communications about employee job performance provided they are made "without malice." (*Ibid.*) Plaintiffs cite *Sanborn v. Chronicle Publishing Co.* (1976) 18 Cal.3d 406, 413 (*Sanborn*) for the proposition that malice exists where " 'the defendant lacked

reasonable grounds for belief in the truth of the publication and therefore acted in reckless disregard of the plaintiff's rights.' " They argue that, without information to support allegations of malice, plaintiffs could not assert their claims.

Plaintiffs' contention they had no idea what evidence led to the February 2015 report until April 2019 when they received discovery in the federal action is belied by the record. In their March 2016 EEOC complaint, plaintiffs alleged Regan "negligently or intentionally[] failed to make an inquiry" into significant aspects of Operstein's complaint and "negligently or intentionally[] made a 'finding' of Dr. Operstein's uncollegiality in making 'baseless' accusations against colleagues," which resulted in Operstein's termination. These allegations show, at the very least, that plaintiffs suspected Regan, in March 2016, of intentionally performing a deficient investigation. This suspicion amounts, at the very least, to a suspicion defendants "lacked reasonable grounds for belief in the truth of the [report].' " (*Sanborn*, *supra*, 18 Cal.3d at p. 413.) Put simply, plaintiffs at least suspected by March 2016 the link they contend was missing until April 2019.

### ii. Equitable tolling

Plaintiffs' equitable tolling argument asserts fraudulent concealment by defendants. "The doctrine of fraudulent concealment tolls the statute of limitations where a defendant, through deceptive conduct, has caused a claim to grow stale." (*Aryeh v. Canon Business Solutions, Inc*. (2013) 55 Cal.4th 1185, 1192, citing *Regents of University of California v. Superior Court* (1999) 20 Cal.4th 509, 533.)

Without citation to any record facts, plaintiffs assert "Seyfarth concealed from Operstein the information which supplied the basis for its findings against her in order to preclude her from providing rebuttal evidence and witnesses and from undermining

24

Seyfarth's false findings against her as the filer of a discrimination complaint on which its business model and dominance as an employer-side lawfirm is based." Defendants correctly respond that plaintiffs cite no evidence they concealed anything from plaintiffs. Plaintiffs' reply brief addresses this deficiency only with a heading—"[Defendants'] contention that there is no evidence [they] concealed anything from Plaintiffs is *contrary to record*"—with no text, much less any record citation, beneath it. Plaintiffs have forfeited their fraudulent concealment argument.

### iii. COVID-19 Emergency Rule 9(a)

Plaintiffs last claim the benefit of COVID-19 Emergency Rule 9(a), which tolled unexpired limitations periods from April 6, 2020 until October 1, 2020. As plaintiffs fail to demonstrate that any of their causes of action were subject to unexpired limitations periods as of April 6, 2020, this rule is inapplicable.

## 5. Attorney Fees and Costs Pursuant to Subdivision (c)(1)

The trial court concluded defendants' attorney fee and cost request was based on reasonable rates and a reasonable amount of time spent in connection with their special motion to strike. It reduced the amount only because it found defendants were only partially prevailing parties. For the reasons set forth above, this was error. Defendants' entire motion was meritorious and should have been granted in full. Accordingly, the court should not have reduced defendants' fee and cost request by $15,978 based on perceived limits to the merits of the motion.

Based on our conclusion that defendants' motion was entirely meritorious, we disregard plaintiffs' arguments that the award was excessive for a partially prevailing or nonprevailing party and consider only plaintiffs' arguments that the fee award was erroneous for reasons unrelated to the merits of defendants' special motion to strike. These arguments are based on policy and equity.

25

As a preliminary matter, we address the standard of review. Ordinarily, where satisfied that a party is entitled to fees and costs pursuant to section 425.16, subdivision (c)(1), we review the amount of the award for abuse of discretion. (*Christian Research Institute v. Alnor* (2008) 165 Cal.App.4th 1315, 1322.) Here, however, plaintiffs assert we should review the award de novo because, according to plaintiffs, the trial judge labored under a conflict of interest in issuing the challenged award. According to plaintiffs, that conflict arose from the judge's personal friendship with CSU's general counsel and vice chancellor. Based on this relationship, plaintiffs characterize the fee award to defendants, who they assert are indemnified by CSU, as an "award[] by the Trial Court to his personal friend." We give no weight to these speculative attacks on the integrity of the trial court. But whatever the standard of review, we are not persuaded by plaintiffs' policy and equity arguments.

As to policy, plaintiffs argue awarding fees to defendants under the circumstances would chill claims pertaining to workplace misconduct, putting the anti-SLAPP statute in conflict with the Fair Employment and Housing Act (FEHA; Gov. Code, § 12900 et seq.) The anti-SLAPP statute provides a "prevailing defendant" on a special motion to strike is "entitled to recover that defendant's attorney's fees and costs." (§ 425.16, subd. (c)(1).) The unqualified mandatory language of subdivision (c) permits no exception for claims implicating FEHA.

As to equity, plaintiffs argue the size of the award relative to Operstein's annual income is excessive and plaintiffs' self-represented status renders them ineligible for fees; that "Seyfarth's wealth and size are relevant"; and the award was unjust because plaintiffs' claims are meritorious and target "the largest lawfirm in the nation engaged in the well-known practice of aiding

26

and abetting FEHA violations." The mandate of subdivision (c)(1) is clear: prevailing defendants are entitled to attorney fees. (See *Ketchum v. Moses* (2001) 24 Cal.4th 1122, 1131 ["under . . . (c), any SLAPP defendant who brings a successful motion to strike is entitled to mandatory attorney fees"].) " ' " 'Rules of equity cannot be intruded in matters that are plain and fully covered by positive statute [citation]. Neither a fiction nor a maxim may nullify a statute.' " ' " (*Timberline, Inc. v. Jaisinghani* (1997) 54 Cal.App.4th 1361, 1368, fn. 5.)

## 6. Arguments Not Addressed Rendered Moot or Deemed Forfeited

Plaintiffs' opening brief contained approximately 124 headings over 58 pages and their reply brief contained approximately 320 headings over 130 pages. In a few instances, the headings introduce so little as, "[t]he title of this section is incorporated herein by reference," or even nothing at all. In many others, they are followed by declaratory statements unsupported by legal authority, record citations, or analysis. Further, some factual citations plaintiffs did provide led to material bearing no apparent relation to the propositions cited.

We have not addressed each individual argument advanced by plaintiffs. In many cases, our analysis rendered their arguments moot. In others, plaintiffs' failure to adequately support an argument with legal analysis and citation to the record excused us from considering the argument at all. (See *United Grand Corp. v. Malibu Hillbillies, LLC* (2019) 36 Cal.App.5th 142, 153 [" 'an appellant must supply the reviewing court with some cogent argument supported by legal analysis and citation to the record[]' "; "[w]e may and do 'disregard conclusory arguments that are not supported by pertinent legal authority or fail to disclose the reasoning by which the appellant reached the conclusions he wants

27

us to adopt' "].)

### 7.     Motions for Judicial Notice

Plaintiffs filed two motions for judicial notice with this court. The first requests judicial notice of documents relating to the trial judge's personal friendship with CSU's general counsel and vice chancellor, which plaintiffs argue amounts to a conflict of interest. None of these documents was presented to the trial court. The second motion requests judicial notice of a mix of court records and Internet postings from both state and private websites. The court records and one of the Internet postings are also offered to demonstrate the trial judge's purported conflict of interest. The other Internet postings are offered to support other arguments plaintiffs make in their briefs. None of these Internet postings was presented to the trial court.

Our authority to take judicial notice is set forth in section 459 of the Evidence Code. It is subject to the limitation that the proffered evidence be relevant. (See *People v. Rowland* (1992) 4 Cal.4th 238, 268, fn. 6 [" 'Because . . . no evidence is admissible except relevant evidence it is reasonable to hold that judicial notice, which is a substitute for formal proof of a matter by evidence, cannot be taken of any matter that is irrelevant . . . .' "].) It is not sufficient that the evidence be relevant to an argument made by its proponent. The evidence must be relevant to the disposition of the matter. (See *Save Lafayette Trees v. East Bay Regional Park Dist.* (2021) 66 Cal.App.5th 21, 29, fn. 2 ["We deny PG&E's request for judicial notice as the additional documents are not necessary to resolve this appeal"]; see also *Hughes Electronics Corp. v. Citibank Delaware* (2004) 120 Cal.App.4th 251, 266, fn. 13 ["As a general matter, judicial notice is not taken of matters irrelevant to the dispositive points on appeal"].) Further, we "generally do not take judicial notice of evidence not presented to the trial court" and will

28

do so only in "exceptional circumstances." (*Vons Companies, Inc. v. Seabest Foods, Inc.* (1996) 14 Cal.4th 434, 444, fn. 3.)

The documents plaintiffs offer to show bias are irrelevant because the bias claim rests on speculation, so the documents could have no effect on the outcome of the appeal.

The remaining documents are also irrelevant. As plaintiffs' own authorities show, we can take judicial notice of the existence of Internet postings but not the truth of the statements contained therein. (*Ragland v. U.S. Bank National Assn.* (2012) 209 Cal.App.4th 182, 194 [recognizing inability to "take judicial notice of the truth of the contents of the Web sites and blogs"].) Plaintiffs offer four of the Internet postings (exhibits 1, 8, 9 and 10 to the second motion for judicial notice) for the truth of their content—statements about the pervasiveness of workplace misconduct at CSU. This is not a proper subject of judicial notice. Perhaps recognizing this, plaintiffs argue they are offering the Internet postings to show " 'the extent of the widespread publicity about the problems' at the CSU with investigation of discrimination and harassment complaints system-wide." (Boldface and italics omitted.) But they fail to explain how this publicity is relevant to any of their arguments.

Finally, plaintiffs request judicial notice of two different versions of Executive Order 1096 (exhibits 5 and 6 to the second motion for judicial notice), which they argue show defendants' investigation was conducted pursuant to an unconstitutional procedure. We decline to consider plaintiffs' arguments concerning the constitutionality of any executive order under which defendants' investigation proceeded because plaintiffs raised this issue for the first time on reply.

## DISPOSITION

We affirm in part and reverse in part the trial court's order and judgment on defendants' section 425.16, subdivision (c) motion for attorney fees and costs.  We remand to the trial court with directions to award defendants the entire $79,889 in fees and costs they requested.  Defendants shall recover their costs on appeal.


GRIMES, Acting P. J.

WE CONCUR:


WILEY, J.


VIRAMONTES, J.

30

Filed 10/20/23

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

|  |  |
|---|---|
| CRAIG ROSS et al.,<br><br>       Plaintiffs and Appellants,<br><br>       v.<br><br>SEYFARTH SHAW LLP et al.,<br><br>       Defendants and Appellants. | B312337<br><br>(Los Angeles County<br>Super. Ct. No. 20SMCV00587)<br><br>**ORDER CERTIFYING<br>OPINION<br>FOR PUBLICATION**<br><br>**[No change in judgment]** |

THE COURT:

The opinion in the above-entitled matter filed on September 29, 2023, was not certified for publication in the Official Reports.  For good cause, it now appears that the opinion should be published in the Official Reports and it is so ordered.

There is no change in the judgment.

_____

GRIMES, Acting P. J.          WILEY, J.          VIRAMONTES, J.